### DONNELLY CORPORATION, Plaintiff,

v.

### REITTER & SCHEFENACKER GmbH & CO. KG, and Reitter & Schefenacker USA Limited Partnership, Defendants.

No. 1:00–CV–751.

United States District Court,
W.D. Michigan,
Southern Division.

March 6, 2002.

---

Thomas R. Behm, Gruel, Mills, Nims & Pylman, Grand Rapids, MI, John A. O'Brien, Bruce M. Wexler, Marc Pensabene, Fitzpatrick, Cella, Harper & Scinto, New York City, Nicholas Philip Groombridge, Josh A. Krevitt, David Greenbaum, Weil, Gotshal & Manges, LLP, New York City, for Plaintiff.

James R. Redford, Plunkett & Cooney, PC, Grand Rapids, MI, Timothy J. O'Hearn, Jones, Day, Reavis & Pogue, Cleveland, OH, for Reitter & Schefenacker GMBH & Co., Reitter & Schefenacker USA Ltd.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on Defendant Reitter & Schefenacker GmbH & Co. KG's Motion to Dismiss for Lack of Personal Jurisdiction. The Court will deny Defendant's Motion.

### I. Standard of Review

The Court may rule on the issue of personal jurisdiction without a hearing if the submissions do not raise disputed issues of fact or require credibility determinations. *Evans Tempcon, Inc. v. Index Indus., Inc.,* 778 F.Supp. 371, 373 (W.D.Mich.1990) (Enslen, J.) (citing *Serras v. First Tennessee Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir.1989)); *cf. Pieczenik v. Dyax Corp.,* 265 F.3d 1329, 1334 (Fed.Cir.2001) (addressing the plaintiff's burden of proof where a court rules on written submissions only). After reviewing the parties' numerous submissions, the Court does not find that a hearing is necessary to resolve any issues of fact.

The parties have been permitted to conduct discovery on the issue of personal jurisdiction. Since the Court determines that an evidentiary hearing is not necessary and will rule on the parties' submissions, Plaintiff Donnelly Corporation ("Plaintiff Donnelly") bears the burden of proving that jurisdiction exists over Defendant Reitter & Schefenacker GmbH & Co. KG ("Defendant R & S GmbH") by a preponderance of the evidence. *See Pieczenik,* 265 F.3d at 1334.

Defendant R & S GmbH submitted three briefs on this issue, and Plaintiff Donnelly submitted two. Therefore, the Court does not find that oral argument is required since all of the issues have been fully addressed by the parties in writing. *See* L. Civ. R. 7.2(d).

## II. Facts

Plaintiff Donnelly has sued Defendant R & S GmbH and Defendant Reitter & Schefenacker USA Limited Partnership ("Defendant R & S USA LP"), alleging patent infringement of three patents owned by Plaintiff.[1] The patents at issue are on designs in automobile rearview mirrors. Defendant R & S GmbH moves for its dismissal from the lawsuit based on its assertion that the Court lacks personal jurisdiction over it.

Defendant R & S GmbH is a German limited partnership, and it is a limited partner in Defendant R & S USA LP. (Eberspaecher Decl., ¶ 6[2]; Warburton Decl., ¶¶ 3, 5.[3]) Defendant R & S USA LP is a Michigan limited partnership and maintains offices in Michigan. (Warburton Decl., ¶¶ 3, 5.) Defendant R & S GmbH wholly owns Reitter & Schefenacker North America, Inc. ("R & S NA"), which is the general partner of Defendant R & S USA LP. (Warburton Decl., ¶ 5.)

Defendant R & S GmbH does not own real property or maintain any physical facilities in Michigan. (Eberspaecher Decl., ¶¶ 3, 5.) It does not hold bank accounts, keep records, or pay taxes in Michigan. (Eberspaecher Decl., ¶¶ 3, 4.) Defendant R & S GmbH is not licensed to do business in Michigan and does not have a registered agent in the state. (Warburton Decl., ¶ 4.)

Defendant R & S GmbH has no manufacturing, testing, or other facilities in the United States. (Eberspaecher Decl., ¶ 5.) Defendant R & S GmbH manufactures and sells automotive lamps, mirrors, and audio systems to customers worldwide, but it asserts that it does not sell these products in the United States. (Eberspaecher Decl., ¶ 6.) Defendant R & S USA LP makes and sells rearview mirrors in the United States. (Warburton Decl., ¶ 3.) Defendant R & S GmbH has sold limited quantities of parts, like springs and washers, to Defendant R & S USA LP's Tennessee facility, but Defendant R & S USA LP has not sold any rearview mirrors in Michigan containing these parts. (Eberspaecher Decl., ¶ 8; Warburton Decl., ¶ 7.) At least 280 shipments of components made to Tennessee are governed by Michigan law by virtue of a choice-of-law clause. (Warburton Dep. Tr., 123:24–125:25; Greenbaum Decl., ¶ 9–10.)

Defendant R & S GmbH has made at least 50 shipments to Defendant R & S USA LP in Michigan. (*See* Exhibit 6— copies of invoices from Defendant R & S GmbH to Defendant R & S USA LP.[4]) These were samples of Defendant R & S GmbH's own allegedly infringing products for use in sales presentations to General Motors and Chrysler in Michigan. (Warburton Dep. Tr., 33:7–34:14, 35:21–37:2, 38:7–25, 41:9–11, 42:8–14, 43:3–45:5.)

---

1. These patents are U.S. Patent Nos. 4,733,-336 ("the '336 patent"); 5,671,996 ("the '996 patent"); and 5,938,321 ("the '321 patent").

2. Helmut Eberspaecher is director of technical coordination at Defendant R & S GmbH and has held that title since January 1, 1993. (Eberspaecher Dep. Tr., 6:4–9.) He has been employed with Defendant R & S GmbH since January 1, 1972. (Eberspaecher Dep. Tr., 5:24–25.)

3. Philip Warburton was employed by Defendant R & S USA LP from December 1995 until June 2001, eventually becoming general manager and then vice president of business development there. (Warburton Dep. Tr., 5:1–5, 9:5–13.) He is now employed by Schefenacker Vision Systems. (Warburton Dep. Tr., 9:14–16.)

4. These invoices are marked "PROFORMA INVOICE" and "Only for customs purposes." Defendant R & S GmbH argues that this form indicates that the items were transferred, not sold, from Defendant R & S GmbH to Defendant R & S USA LP.

Defendant R & S GmbH designed the two allegedly infringing products for Defendant R & S USA LP to sell and delivered its designs to Defendant R & S USA LP in Michigan. (Warburton Dep. Tr., 62:3–64:1; Eberspaecher Dep. Tr. 18:21–20:21, 48:17–49:14; Defendant R & S GmbH's Supp. Resp. to Int. 2, 8/16/01, at 4; Defendant R & S GmbH's Supp. Resp. to Ints. 1–2, 8/21/01, at 3–4.) Defendant R & S GmbH prepared and made the offer to Mercedes which resulted in production of an allegedly infringing product by Defendant R & S USA LP. (Eberspaecher Dep. Tr., 148:12–150:3.) Furthermore, Defendant R & S GmbH guaranteed the contract under which Defendant R & S USA LP sells allegedly infringing products to Mercedes. (Warburton Dep. Tr., 97:16–101:23; Supply Agreement between Mercedes and Defendant R & S USA LP, at 22.)

Defendant R & S GmbH employees participated in at least one sales presentation to a car company in Michigan in support of Defendant R & S USA LP. (Warburton Dep. Tr., 41:9–44:3; Eberspaecher Dep. Tr., 85:5–88:25, 90:21–92:5.) Defendant R & S GmbH has also sent its representatives to Michigan to meet with "worldwide customers" to solicit business outside the United States. (Eberspaecher Decl., ¶ 10.)

Defendant R & S GmbH purchases glass from Gentex Corporation in Zeeland, Michigan for use in car mirrors, which are then sold outside the United States. (Eberspaecher Decl., ¶ 12.) In addition, Defendant R & S GmbH purchases garage door openers from Johnson Controls, Inc., also in Zeeland, Michigan, for use in car rearview mirrors, which are also sold outside the United States. (*Id.*)

In the relevant past, three employees of Defendant R & S GmbH have worked with Defendant R & S USA LP engineers in Michigan. (Warburton Decl., ¶ 8.) The three were employed by Defendant R & S GmbH and stationed in Michigan to provide technical assistance on product lines of Defendant R & S USA LP. (Warburton Dep. Tr., 21:24–22:6.)

One of those three employees, Elke Deiter, went to work at Defendant R & S USA LP in Michigan after working for Defendant R & S GmbH in Germany. (Eberspaecher Dep. Tr., 37:6–23; Warburton Dep. Tr., 19:19–23.) Mr. Eberspaecher said at his deposition that during the period that she was in Michigan, Ms. Deiter no longer reported to Defendant R & S GmbH employees, but she asked for Mr. Eberspaecher's "advice" about once a month on Defendant R & S USA LP's projects. (Eberspaecher Dep. Tr., 37:16–38:9.) Two other employees of Defendant R & S GmbH, Jens Mertens and Gerhard Fanzott, were also stationed at Defendant R & S USA LP in Michigan. (Warburton Dep. Tr., 19:19–23.)

Mr. Warburton, as part of Defendant R & S USA LP management, reported on the performance of the three employees from Defendant R & S GmbH to Mr. Eberspaecher at Defendant R & S GmbH. (Warburton Dep. Tr., 9:17–19, 28:23–29:12.) Mr. Warburton also gave the three employees of Defendant R & S GmbH their work assignments. (Warburton Dep. Tr., 25:23–25.) Management from Defendant R & S GmbH sets strategic goals for Defendant R & S USA LP and receives monthly reports from Defendant R & S USA LP. (Warburton Dep. Tr., 15:1–16:25.) "Management" included Alfred Schefenacker, described by one affiant as the owner of Defendant R & S GmbH, and Werner Zimmerman, who is on Defendant R & S GmbH's board of directors. (Warburton Dep. Tr., 16:17–25.)

Defendant R & S GmbH employees generally provided technical support to Defendant R & S USA LP in the form of phone calls, e-mails, and personal visits to Michi-

gan while Defendant R & S USA LP was manufacturing allegedly infringing products. (Warburton Dep. Tr., 107:15–110:14.) Representatives of Defendant R & S GmbH have been sent to Michigan to oversee supply contract arrangements for supplies that are delivered outside the United States and used in products sold outside the United States. (*Id.*)

In all, Defendant R & S GmbH has sent its personnel to Michigan around every other month for business purposes, including visits to Michigan suppliers (Eberspaecher Dep. Tr., 56:5–18, 71:3–72:4), visits to potential customers like the Big Three auto companies[5] (Eberspaecher Dep. Tr., 71:3–24; Defendant R & S GmbH's Supp. Resp. to Int. 3, at 5.), and visits to attend trade shows like the Detroit Motor Show (Eberspaecher Dep. Tr., 71:3–72:4; Defendant R & S GmbH's Supp. Resp. to Int. 3, at 5.).

Finally, Defendant R & S GmbH itself directly sells the accused mirrors to Mercedes in Germany. (Defendant R & S GmbH's Resp. to Request for Admission No. 3, 5/11/01, at 4.) Some of those mirrors are installed by Mercedes into vehicles that Mercedes sells all over the United States, and Defendant R & S GmbH makes a special version of the mirror for cars bound for United States sale. (Eberspaecher Dep. Tr., 134:3–137:4.) Defen-

dant R & S GmbH designs and manufactures these accused mirrors that Mercedes will put in cars bound for the United States to comply with American federal regulations. (Eberspaecher Dep. Tr., 138:24–141:18.) Defendant R & S GmbH also labels these mirrors to alert Mercedes to the difference between the ones suitable for cars destined for the United States and elsewhere. (Eberspaecher Dep. Tr., 135:10–137:4.) Defendant R & S GmbH is aware that its accused mirrors are sold within Mercedes vehicles and as spare parts through the Mercedes dealership network that extends throughout the United States and includes the State of Michigan. (Eberspaecher Dep. Tr., 98:25–100:9; Warburton Dep. Tr., 93:10–24.)[6]

## III. Analysis

■ A federal court applies the state jurisdictional statutes of the state in which it sits when determining whether it has personal jurisdiction over a defendant, even when the cause of action, like patent infringement, is federal. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1569 (Fed.Cir.1994); Fed.R.Civ.P. 4(e), (k). Federal Circuit law controls the issue of whether a non-resident Defendant accused of patent infringement is subject to personal jurisdiction. *Beverly Hills Fan*, 21 F.3d at 1568. Personal jurisdic-

5. The "Big Three auto companies" refers to General Motors, Ford, and Chrysler (now DaimlerChrysler).

6. Contacts of an individual partner in a limited partnership are the only ones relevant to the general jurisdiction inquiry. *See Sher v. Johnson*, 911 F.2d 1357, 1365–66 (9th Cir. 1990). A partner is an agent of the partnership when carrying on partnership business in the usual manner, and the actions of an agent are attributable to the principal. *Id.* at 1366. Therefore, contacts of the partners can establish jurisdiction over the partnership. *Id.* However, contacts of the partnership do not "ordinarily" establish jurisdiction over

the partners because an individual partner is not an agent for the other partners. *Id.See also Ytuarte v. Gruner & Jahr Printing and Publ'g Co.*, 935 F.2d 971, 972–73 (8th Cir. 1991); *Marriott PLP Corp. v. Tuschman*, 904 F.Supp. 461, 466–67 (D.Md.1995); *Tuttle v. Lorillard Tobacco Co.*, 118 F.Supp.2d 954, 960 (D.Minn.2000). This Court can imagine that it might be proper to hold that a partnership has been acting as the agent of a partner, and thus attribute the contacts of the partnership to a partner. Nevertheless, this Court has examined and considered only those contacts which are fairly attributable to Defendant R & S GmbH.

tion over a non-resident Defendant includes two inquiries: whether the state's long-arm statutes permit service of process on Defendant, and if so, whether assertion of jurisdiction would violate Constitutional due process. *Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1358 (Fed.Cir.1998).

Under Michigan's long-arm statutes and the Due Process Clause, the Court may exercise either specific [7] or general personal jurisdiction. In summary, specific jurisdiction may only attach if Plaintiff's claims arise from acts committed by Defendant in Michigan. *See HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 (Fed.Cir.1999). General jurisdiction subjects a defendant to any suit in Michigan and may only attach if Defendant's contacts with Michigan were "continuous and systematic." *See Aristech Chemical Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 627 (6th Cir.1998); Mich. Comp. Laws § 600.711(3).

## A. Specific Jurisdiction

The Federal Circuit defers to the state's highest court in interpreting long-arm statutes. *HollyAnne Corp.*, 199 F.3d at 1307. The Michigan long-arm statute conveying limited jurisdiction is coextensive with the limits of federal due process. *Green v. Wilson*, 455 Mich. 342, 565 N.W.2d 813, 816 (1997). But this means that the specific categories of jurisdiction designated by the statute are as broad as the federal due process clause will allow, not that Michigan law permits the exercise of jurisdiction over any matter whatsoever that due process would allow. *See id.* at 816 & n. 6. The two concepts are not equal, and thus, a separate inquiry is required under both the Michigan long-arm statute and the due process clause. *Id.* at 816–17.

## 1. Whether There is Limited Jurisdiction Under Michigan's Long–Arm Statute

Michigan's long-arm statute reads:

The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation *arising out of the act or acts which create any of the following relationships:*

(1) The transaction of any business within the state.

(2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

(3) The ownership, use, or possession of any real or tangible personal property situated within the state.

(4) Contracting to insure any person, property, or risk located within this state at the time of contracting.

(5) Entering into a contract for services to be performed or for materials to be furnished in the state by the defendant.

Mich. Comp. Laws § 600.715 (emphasis added). Thus, the Court may exercise specific personal jurisdiction over Defendant R & S GmbH only for claims "arising out of" contacts with Michigan.

Patent infringement occurs when a party "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the terms of the patent therefor." 35 U.S.C. § 271(a) (2001). In addition,

---

7. The terms "specific" and "limited" personal jurisdiction are used interchangeably and are the same type of personal jurisdiction. The Michigan statute refers to "limited" jurisdiction, so the Court will use that term when referring to Michigan law.

inducing infringement of a patent makes one liable as an infringer. 35 U.S.C. § 271(b) (2001). Thus, for the action to "arise out of" activities taking place in Michigan, Defendant R & S GmbH's activities in Michigan must constitute "making," "using," "offering to sell," "selling," or "importing" the allegedly infringing product, or its activities must constitute inducing alleged infringement. Moreover, those activities must fit under one or more of the enumerated categories of bases for personal jurisdiction in Michigan. *See* Mich. Comp. Laws § 600.715(1)-(5).

Any of those activities, if Defendant R & S GmbH is conducting them, would fit under at least one enumerated category of permissible jurisdiction under the Michigan statute. First, patent infringement is treated as a tort for these purposes. " 'Infringement is essentially a tort, and implies invasion of some right of the patentee.' The invasion of that right would occur where the infringing article is sold or used or where infringement is induced."

*Amburn v. Harold Forster Indus., Ltd.*, 423 F.Supp. 1302, 1303 (E.D.Mich.1976) (quoting *Carbice Corp. v. American Patents Dev. Corp.*, 283 U.S. 27, 33, 51 S.Ct. 334, 75 L.Ed. 819 (1931)); *see also Beverly Hills Fan*, 21 F.3d at 1563.

Second, each of the underlying acts which could constitute patent infringement if proven, like selling or offering to sell an infringing product, fall under one of the limited jurisdiction categories, like making a contract or transacting business. *See* Mich. Comp. Laws § 600.715(1), (5). Therefore, it is the Court's task to determine whether there is sufficient evidence that Defendant R & S GmbH's Michigan activities would constitute patent infringement if the products at issue are infringing.[8] The Court finds that Defendant R & S GmbH's activities in Michigan constitute "using," "selling," and "inducing infringement" of an accused product. Therefore, Michigan's limited jurisdiction statute authorizes exercise of jurisdiction over Defendant R & S GmbH.[9]

---

**8.** The standard for evaluating the merits of a claim for purposes of personal jurisdiction, to the extent that acts must exist to result in a finding that the claim "arose out of" conduct in the forum state, is not the same as it would be under a summary judgment motion. *Cf. Ardco, Inc. v. Page, Ricker, Felson Marketing, Inc.*, 25 U.S.P.Q.2d 1382, 1385 (N.D.Ill.1992) (quoting *Intermedics, Inc. v. Ventritex, Inc.*, 775 F.Supp. 1269 (N.D.Cal.1991)) ("the venue standard is 'less strict than the standard required to establish patent infringement, for otherwise a disposition of the venue question would also amount to a disposition on the merits whenever venue is tested' "). To evaluate personal jurisdiction on a summary judgment standard would require full-blown discovery from the outset of every litigation to provide the plaintiff with a fair chance at proving jurisdiction, which would not be a wise use of the parties' or the Court's resources. Therefore, this Court's findings in this section are only significant to the issue of personal jurisdiction.

**9.** The Court did not find that Defendant R & S GmbH "made," "imported," or "offered to sell" an accused product in Michigan. Defendant R & S GmbH sent samples of products to Defendant R & S USA LP, but these samples were not for direct sale to customers. This Court finds that "imports" likely means bringing a product into the country for purposes of sale under the patent statute. *See Cybiotronics, Ltd. v. Golden Source Electronics, Ltd.*, 130 F.Supp.2d 1152, 1176 (C.D.Cal. 2001) (sending samples of products into the United States did not change the defendant into an importer from an exporter, such that patent laws applied). As a result, Defendant R & S GmbH's activities in Michigan do not constitute "importing." There is no evidence of an "offer to sell" because even if Defendant R & S GmbH's involvement in the offer made to Mercedes could be considered an "offer to sell," there is no evidence as to where that offer was made.

*Whether Defendant R & S GmbH "Used" an Allegedly Infringing Product in Michigan*

■ As to whether Defendant R & S GmbH has "used" an allegedly infringing product within Michigan, there is evidence that Defendant R & S GmbH was present at a meeting in Michigan with Daimler-Chrysler and that an accused mirror was on display at the meeting.[10] Other courts have held that "the mere demonstration or display of an accused product, even in an obviously commercial atmosphere, does not constitute an infringing use under § 271(a)." *Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1269, 1286 (N.D.Cal. 1991); *see also L.A. Gear, Inc. v. E.S. Originals, Inc.,* 859 F.Supp. 1294, 1298 (C.D.Cal.1994).

Typically, these courts have held that some evidence is required that the demonstration of an accused product led to a sale of the product before the demonstration can be considered "use." *See, e.g., Intermedics,* 775 F.Supp. at 1286. That definition of "use" stretches the plain and ordinary meaning of the word beyond recognition and seems contrary to logic, however. Regardless of whether the display of the product to a potential customer resulted in a sale, the alleged infringer was still attempting to garner sales by displaying the accused product. This Court fails to see how the display of an accused product is only threatening to the rights of the patentee if successful.

Moreover, this definition of "use" seems contrary to the Federal Circuit's interpretation of Congressional intent under the patent statute. The Federal Circuit found that Congress was trying to prevent in-

fringers from generating commercial interest in an infringing product by adding a prohibition on "offering to sell" in the patent statute. *See 3D Systems, Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1379 (Fed. Cir.1998) ("One of the purposes of adding 'offer[ ] to sell' to § 271(a) was to prevent exactly the type of activity [the defendant] has engaged in, i.e., generating interest in a potential infringing product to the commercial detriment of the rightful patentee."). The purpose of the patent statute is, after all, to protect the commercial rights of patent holders. It seems more likely, then, that prohibited "use" would include displaying an infringing product in the context of a sales meeting.

The evidence before the Court shows that the mirrors were on display during at least one meeting in Michigan by Defendant R & S GmbH and Defendant R & S USA LP with a potential customer. The purpose of this meeting was clearly to "generat[e] interest in a potential infringing product to the commercial detriment of the rightful patentee." *See 3D Systems,* 160 F.3d at 1379 (discussing the "offering to sell" provision of § 271(a)). As such, Plaintiff Donnelly has met its burden that Defendant R & S GmbH "used" the accused product in Michigan.

*Whether Defendant R & S GmbH "Sold" an Allegedly Infringing Product in Michigan*

■ Furthermore, there is the question of whether Defendant R & S GmbH's conduct in Michigan constituted selling an allegedly infringing product. Defendant R & S GmbH sent samples of its own allegedly infringing products for use in sales

---

10. Defendant R & S GmbH represents that the mirror at issue was not discussed at the meeting with DaimlerChrysler. Plaintiff Donnelly also alleged that the accused mirror was part of a presentation to General Motors as well, but Defendant R & S GmbH counters that it was not present at that meeting, even if it seems apparent that the mirror sent into Michigan by Defendant R & S GmbH was probably available for inspection at the meeting.

presentations by Defendant R & S USA LP to General Motors and Chrysler in Michigan. It also sent its employees to participate in sales presentations to the car companies in Michigan. Defendant R & S GmbH prepared and made the offer to Mercedes which resulted in a contract with Defendant R & S USA LP to sell Mercedes allegedly infringing products, and Defendant R & S GmbH also guaranteed the contract. But these activities only assisted Defendant R & S USA LP sell its products, even if that assistance was perhaps crucial. Those activities do not constitute Defendant R & S GmbH selling its own products in Michigan.

It is on the basis that these activities differ significantly from the activities involved in the cases cited by Plaintiff Donnelly. All of those cases concerned companies who were selling a product that they were producing themselves overseas and then purposefully choosing distribution channels to transport the product into the United States. *See, e.g., Viam Corp. v. Iowa Export–Import Trading Co.,* 84 F.3d 424, 426, 428–29 (Fed.Cir.1996) (foreign company distributed its products directly into U.S. market by using American export company); *Beverly Hills Fan,* 21 F.3d at 1560, 1564–66 (same); *Worldtronics Int'l, Inc. v. Ever Splendor Enter. Co., Ltd.,* 969 F.Supp. 1136, 1138, 1141–42 (N.D.Ill.1997) (Taiwanese company made coffee makers and sold them to distributor outside of United States, knowing distributor would sell them in the United States); *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.,* 803 F.Supp. 626, 628, 632–36 (E.D.N.Y.1992) (foreign defendant made fax machines in Japan and then American distributor sold them in United States).

However, Plaintiff Donnelly also claims that Defendant R & S GmbH was "selling" its accused mirrors in the United States because it sold mirrors specifically designed for the American market generally, although not for the market of any one particular American state, to Mercedes in Germany. Mercedes installed those mirrors into cars bound for the United States, which are sold throughout the United States, including in Michigan. Defendant R & S GmbH knew that its mirrors would be installed in cars destined to be sold in the United States.

Placing an item within the "stream of commerce" in the United States can subject an entity to personal jurisdiction in a state in which the item ends up for sale. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 111–16, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Beverly Hills Fan,* 21 F.3d at 1566. However, it is unclear what showing of involvement in a particular state's market is constitutionally required before a defendant can be subject to jurisdiction because it placed a product in the stream of commerce.

The *World–Wide Volkswagen* Court held if the defendant's conduct and connection with the forum state are such that the defendant can foresee being haled into court there, exercise of personal jurisdiction in the forum state is constitutional. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559.

[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States .... The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will

be purchased by consumers in the forum State.

*Id.* at 297–98, 100 S.Ct. 559.

In *Asahi*, "apparently all of the Justices agreed that the stream of commerce theory provides a valid basis for finding requisite minimum contacts. The split was over the exact requirements for an application of the theory." *Beverly Hills Fan*, 21 F.3d at 1566. In fact, the Justices split four to four as to the requirements.[11]

Justice O'Connor wrote for herself and three other justices when she wrote, "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. "Additional conduct" demonstrating intent to serve the forum state's market is necessary to constitutionally subject a defendant to personal jurisdiction under stream of commerce theory. *Id.* Mere knowledge that the product will end up in the forum state is insufficient. *Id.* Examples of "additional conduct" included: designing the product for the forum state's market, establishing channels for providing regular advice to the forum state's customers, or marketing through a distributor agreeing to serve as a sales agent in the forum State. *Id.*

Disagreeing that this level of direction of a product was constitutionally required to subject a defendant to suit in a forum state, Justice Brennan wrote for himself and three other Justices. *See Asahi*, 480 U.S. at 116–21, 107 S.Ct. 1026 (Brennan, J., concurring). He concluded that personal jurisdiction is constitutional when "the regular and anticipated flow of products" take the defendant's product into the forum state. *Id.* at 117, 107 S.Ct. 1026. Where products landed in the forum state through the "unpredictable currents or ed-

dies" of the flow of commerce, the defendant did not purposefully direct the product into the forum state and could not constitutionally be subject to personal jurisdiction. *Id.* "A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity." *Id.*

This Court is bound by the law of the Federal Circuit as to this issue in a patent infringement case. *Beverly Hills Fan*, 21 F.3d at 1564–65. In *Beverly Hills Fan*, the Federal Circuit examined both of the relevant Supreme Court cases, as well as the two different suggested standards for applying stream of commerce theory, and found it unnecessary "to join this debate since ... under either version of the stream of commerce theory, plaintiff made the required jurisdictional showing." *Id.* at 1566. There, a Chinese company manufactured an accused fan in Taiwan, and an importer located in New Jersey brought the fans into the United States and sold them throughout the country. *Id.* at 1560. The company was sued in Virginia, and the Federal Circuit held that exercise of personal jurisdiction was proper there because it was foreseeable that a termination point of the distribution channel was in Virginia and that fans would be sold there. *Id.* at 1564. " ... [P]laintiff has stated all of the necessary ingredients for an exercise of jurisdiction consonant with due process: defendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipat-

---

**11.** The ninth Justice, Justice Stevens, wrote separately to note that the issue was not necessary to the decision in that case. *Asahi,* 480 U.S. at 121, 107 S.Ct. 1026 (Stevens, J., concurring).

ed being brought into court there." *Id.* at 1566.

The *Beverly Hills Fan* Court, however, made no mention of "additional conduct" aimed at putting the fans into Virginia specifically, *versus* the United States' market generally. *Cf. id.* at 1564–66. Given this, this Court respectfully disagrees that Justice O'Connor's "additional conduct" version of stream of commerce theory was satisfied. Certainly, however, these facts would satisfy Justice Brennan's standard.

In *Viam Corp.*, the Federal Circuit again did not decide which version of stream of commerce theory should guide district courts because it found that the defendant purposefully directed its products into California under either version. *Viam Corp.*, 84 F.3d at 428. The *Viam Corp.* Court found that the defendant

> did not simply place its product into the stream of commerce. [The defendant] knowingly and intentionally exploited the California market through its exclusive distributor's advertising in California, and by establishing channels for providing regular advice in California. [The distributor] advertised and sold, and is presently advertising and selling, [the defendant's] products, including the subject of the '386 patent, in California, and [the defendant] provided [the distributor] numerous sales aids which [the defendant] knew would be used in Cali-

fornia for selling [the defendant's] products there.

*Id.* at 429.[12] Here, the Federal Circuit specifically noted that the defendant engaged in "additional conduct" to aim the product to the California market beyond merely selling in the United States with the knowledge that the accused product could end up in California, which is what Justice O'Connor's theory would require. This discussion distinguishes *Viam Corp.* from the analysis in *Beverly Hills Fan.*

However, despite the discussion cited above, the facts described in *Viam Corp.* do not reveal any particular tailoring of the marketing strategy or the product to the state of California. *Cf. id.* at 428–30. The distribution in California appears to have been the same as it was into every other state in which the distributor sold the product. *Cf. id.* Again, this Court respectfully finds that under these facts, only Justice Brennan's version of the stream of commerce theory is satisfied.

Given the results in these cases, this Court finds that the Federal Circuit, if deciding which version of the stream of commerce theory it believes to be required by the Constitution, would follow the standard enunciated in Justice Brennan's version of the theory.[13] This conclusion appears apt from the Federal Circuit's previous analyses.

Turning to the instant case, the Court notes that Defendant R & S GmbH en-

---

12. The distributor in *Viam Corp.* was also a defendant in the suit, but the motion to dismiss for lack of personal jurisdiction concerned only the Italian manufacturer-defendant, so the Court has referred only to this entity as "the defendant" to describe the case and its actors with less confusion.

13. This Court is cognizant of its previous decision employing Justice O'Connor's version of stream of commerce theory. *See Evans Tempcon*, 778 F.Supp. at 375 (Enslen, J.). However, in that matter, this Court was re-

quired to apply stream of commerce theory as it believed that Sixth Circuit law would dictate, since *Evans Tempcon* was before the Court based on the diversity of citizenship of the parties. *Cf. id.* at 373. In this matter, this Court is bound to apply the law of the Federal Circuit, and the two analyses are not the same. Moreover, in *Evans Tempcon*, the question of whether Justice O'Connor's more stringent test was constitutionally required was not before the Court since the facts in that matter satisfied Justice O'Connor's test. *Cf. id.*

gaged in "additional conduct" to tailor its accused mirror to the United States market, by designing it specially to comply with American federal regulations. Defendant R & S GmbH further labels the mirrors "USA" to alert Mercedes to the fact that these particular mirrors were for installation in cars destined for sale in the United States. However, Defendant R & S GmbH did not engage in any "additional conduct" to purposely direct the accused mirrors for sale into any *particular* American state, which would apparently be required under Justice O'Connor's version of the theory. *Cf. Asahi,* 480 U.S. at 112, 107 S.Ct. 1026.

Justice Brennan's version of stream of commerce theory would clearly be satisfied, however. Defendant R & S GmbH's accused mirror landed in Michigan through "the regular and anticipated flow of products." *See Asahi,* 480 U.S. at 117, 107 S.Ct. 1026 (Brennan, J., concurring.) It is true that the accused mirrors came to the United States by way of Mercedes, in that they were delivered to dealerships as part of an assembled Mercedes vehicle or as a spare part from Mercedes. But that is no different from using a distributor to market a product in the United States and intending that the products land there. Defendant R & S GmbH had to expect suits in the United States arising out of its sale of the mirrors, given that it directed the mirrors to American markets and given the involvement that Defendant R & S GmbH had in the United States. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559. Therefore, this Court finds that Defendant R & S GmbH's placement of the accused mirror into the American stream of commerce was such that Defendant R & S GmbH had to expect that being subject to suit in Michigan was possible.

Moreover, when strictly analogizing the facts of this matter to the facts in *Beverly Hills Fan* and *Viam Corp.,* this Court believes that this is the course of action that the Federal Circuit would take. The facts in the instant matter are more remarkable than those in either *Beverly Hills Fan* or *Viam Corp.* Defendant R & S GmbH specially provided an accused mirror that complied with American federal regulations and marked it as destined for United States markets. There was no such indication in either *Beverly Hills Fan* or *Viam Corp.,* but the Federal Circuit still found that placement of the accused product within the stream of commerce should have led the defendants to expect suit in the states at issue in those cases.

*Whether Defendant R & S GmbH "Induced Infringement" in Michigan*

■ Finally, the parties disagree whether Defendant R & S GmbH's conduct in Michigan constituted "inducing infringement" by another entity. Active inducement is "actively and knowingly aiding and abetting another's direct infringement." *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1195 (Fed.Cir.1996). Defendant R & S GmbH must have had specific intent to induce some entity to infringe the patent of another in Michigan, but need not have taken the steps within Michigan to induce that infringement. *See Columbia Univ.,* 150 F.Supp.2d at 205 ("extraterritorial activity that induces direct infringement within the United States may incur liability").

"The linchpin for § 271(b) liability is an actor's specific intent to induce—i.e. the knowledge that the product in question infringes on the patent of another—and the steps undertaken actively to encourage or advance the infringement." *Id.* Circumstantial evidence can suffice to prove that intent. *Id.* at 206. Defendant R & S GmbH argues that it did not induce the infringement of either of the two possible entities that it could have induced to in-

fringe, Mercedes and Defendant R & S USA LP.

Management from Defendant R & S GmbH makes goals for and receives monthly reports from Defendant R & S USA LP. Moreover, Defendant R & S GmbH prepared and made an offer to Mercedes, whereupon Defendant R & S USA LP entered into a contract with Mercedes and produced products to satisfy the contract. Defendant R & S GmbH also guaranteed the contract between Mercedes and Defendant R & S USA LP.[14]

The Court finds that there is sufficient evidence that acts of Defendant R & S GmbH could have induced infringement within Michigan. Defendant R & S GmbH argues that its "interactions" with Defendant R & S USA LP cannot constitute induced infringement in Michigan because it designed the mirror in Germany, and Defendant R & S USA LP manufactured the mirrors in Tennessee and sold them to Mercedes in Alabama.[15] But Defendant R & S GmbH was not casually "interacting" with Defendant R & S USA LP. Defendant R & S GmbH provided the means to Defendant R & S USA LP within Michigan to produce the allegedly infringing mirrors, by sending samples and designs there, by sending employees there to provide technical support as to the production of the mirrors, and by providing technical and other business support from Germany to Michigan over the phone and by e-mail to USA LP employees in Michigan. Thus, there is sufficient evidence to support Plaintiff Donnelly's allegation that Defendant R & S GmbH took actions in Michigan to induce infringement.[16]

14. The Court could not find any indication where the contract between Mercedes and Defendant R & S USA LP was made. Notices under the contract were to be sent to Defendant R & S USA LP's law firm in Michigan, Dickinson Wright, to a Detroit office, which is some evidence of the contract's Michigan connection. (*See* Warburton Dep. Tr., 106:16–107:4; Supply Agreement between Mercedes and Defendant R & S USA LP, at 19.) On the other hand, the contract contains a choice-of-law provision choosing Alabama law and a forum selection clause choosing Alabama courts. (See Supply Agreement between Mercedes and Defendant R & S USA LP, at 20.) Nonetheless, the Court finds that the other facts are sufficient to support the allegation that Defendant R & S GmbH engaged in activities in Michigan constituting inducing alleged infringement.

15. Part of Defendant R & S GmbH's argument that it did not induce infringement of either Mercedes or Defendant R & S USA LP is that it alleges it did not exercise any control over the production of either entity and therefore must have, as a matter of law, lacked intent to induce infringement. The Court disagrees. It is true that at least one other court has held that if a party exercises no meaningful control over the production of an item, that *can* support a finding that the party lacked actual intent to induce infringement. *Trustees of Columbia Univ. v. Roche Diagnostics GmbH*, 150 F.Supp.2d 191, 206 (D.Mass. 2001); *see also Ardco, Inc. v. Page, Ricker, Felson Marketing, Inc.*, 25 U.S.P.Q.2d 1382, 1385 (N.D.Ill.1992) (where the defendant does not exercise control over the sale of a patented device, the relationship is too peripheral to sustain a finding of inducement). But it is not a necessary conclusion that an inducer must, as a matter of law, have control over production of the actual infringer. Nor does this Court think it would be a wise conclusion that production control is dispositive under the statute. In addition, it is disputed what level of control that Defendant R & S GmbH exercised over Defendant R & S USA LP's production. Based on the evidence that Defendant R & S GmbH makes goals for and receives monthly reports from Defendant R & S USA LP, etc., it is difficult to fathom that Defendant R & S GmbH would not have some level of at least indirect control over production at Defendant R & S USA LP.

16. There is no need to consider whether Mercedes would be considered an infringer and whether Defendant R & S GmbH induced Mercedes' infringing in Michigan since Defendant R & S GmbH's relationship with Defendant R & S USA LP is enough to establish

A close look at the facts of some of the cases cited by the parties reinforces this conclusion. In *Columbia Univ.*, a Germany company, Roche, was accused of inducing infringement by an American company, Genetics Institute ("GI"), where Roche and GI negotiated a highly integrated collaboration to produce a drug. *Columbia Univ.*, 150 F.Supp.2d at 207. GI was compensated for researching and developing commercially feasible production clones of cells, and both parties jointly owned any intellectual property developed during the course of the project. *Id.* at 194. Roche also retained rights of inspection and access to confidential information. *Id.* at 207. The Court noted that Roche's involvement with GI was "more intimate than that of mere customer. [Roche] was the principal underwriter of the research in question." *Id.* Given the nature of the relationship between Roche and GI, the *Columbia Univ.* Court denied Roche summary judgment on the claim that it had induced patent infringement on a patent at issue. *Id.* at 208.

Similarly, in another case where the defendant directly solicited the sales at issue and delivered actual orders to the infringer, as well as handled the products through their warehouse operations and was responsible for delivery, the court denied summary judgment as to whether defendant was inducing infringement. *Quantum Group, Inc. v. American Sensor, Inc.*, 48 U.S.P.Q.2d 1436, 1439 (N.D.Ill. 1998). Where a sales representative is not "independent" from the alleged infringer, it can be held liable for inducing infringement. *See id.*

This is in contrast to a sales representative considered to be "independent," in that it was selling products on behalf of many clients. *See Ardco, Inc. v. Page,*

*Ricker, Felson Marketing, Inc.*, 25 U.S.P.Q.2d 1382, 1385 (N.D.Ill.1992). In *Ardco*, the defendant did not exercise any control over sale, manufacture, or creation of the allegedly infringing product, and the *Ardco* Court found as a result that the relationship was too peripheral to find induced infringement. *Id.* at 1384–85. Activities including attending trade shows, visiting distributors, and soliciting potential customers were held to be not enough to find induced infringement. *Id.* This was particularly because the allegedly infringing product was only one of many products marketed by the defendant for the alleged infringer. *Id.* The Ardco Court also noted that the defendant did not make the specific sales directly at issue, it did not forward on the orders, and it did not deliver the products. *Id.* at 1384–85.

Defendant R & S GmbH engaged in additional activities beyond attending trade shows and talking to potential customers of Defendant R & S USA LP, although it engaged in those activities too. Defendant R & S GmbH was promoting sales of Defendant R & S USA LP presumably because it is a limited partner in that entity. Defendant R & S GmbH was more than a sales representative, but instead had a tightly collaborative relationship with Defendant R & S USA LP, "lending" it employees of R & S GmbH, providing technical support and other advice, guaranteeing a contract, setting goals, etc. As a limited partner in Defendant R & S USA LP, Defendant R & S GmbH would benefit from USA LP's success directly, and not merely as a "sales representative" of Defendant R & S USA LP. This would explain Defendant R & S GmbH's rather active role in a business supposedly completely separate from it.

alleged inducement of patent infringement     within Michigan.

### 2. Whether Federal Due Process is Satisfied by Exercise of Specific Jurisdiction

■ Exercise of specific personal jurisdiction comports with federal due process when the cause of action arises out of Defendant R & S GmbH's purposeful contacts with Michigan and when exercising jurisdiction is reasonable and fair. *3D Systems*, 160 F.3d at 1378. All three elements of this test must be met: (1) Defendant R & S GmbH must have purposely directed its activities at the residents of the forum; (2) the claim against Defendant must arise out of or be related to those activities; and (3) the assertion of personal jurisdiction must be reasonable and fair. *Id.*

First, the Court finds that Defendant R & S GmbH has purposely directed its activities at Michigan residents and in Michigan. Certainly, Defendant R & S GmbH initiated its Michigan contacts and purposely took actions within the state on numerous occasions which give rise to the current claims against it. For a relevant period of time, Defendant R & S GmbH sent its employees to the state to work at Defendant R & S USA LP, specifically because of their expertise in certain products. Defendant R & S GmbH directed technical assistance and business oversight to the operating headquarters of Defendant R & S USA LP in Michigan. Defendant R & S GmbH also attended trade shows and talked to potential customers of Defendant R & S USA LP in Michigan, as well as sent allegedly infringing products as samples to Michigan.

Second, the Court has found in the previous section that the claims against Defendant R & S GmbH have arisen out of its activities in Michigan.

Third, the Court finds that the exercise of specific personal jurisdiction is reasonable and fair. In assessing the fairness and reasonableness of the exercise of personal jurisdiction, the Court is to consider the burden on Defendant R & S GmbH, the interests of Michigan, Plaintiff Donnelly's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive policies. *Asahi*, 480 U.S. at 114, 107 S.Ct. 1026.

The burden on Defendant R & S GmbH to litigate in this Court does not seem unreasonable, particularly given the involvement in Michigan which Defendant R & S GmbH has previously initiated on its own. Defendant R & S GmbH has offered no specific reason why litigating in this Court is burdensome to it other than the distance from its home. While the Court is not unsympathetic to the burden that distance creates, such distances are part of the reality of modern business and are not enough alone to make a particular forum unfair and unreasonable to settle a dispute. *See, e.g., Beverly Hills Fan*, 21 F.3d at 1569 ("progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome"). This is particularly true in cases like the instant one, where Defendant R & S GmbH has shown a willingness to travel to Michigan in other contexts.

Moreover, the Federal Circuit has indicated that jurisdiction is unreasonable and unfair only in the limited situations where the plaintiff's interest and the state's interest in adjudicating the dispute in the forum in question are so attenuated as to be clearly outweighed by the burden borne by the defendant defending in that forum. *Beverly Hills Fan*, 21 F.3d at 1568. Plaintiff Donnelly clearly has an interest in' adjudicating the dispute here, since it alleges that infringing activity took place here. The State of Michigan has the same interest in seeing claims of patent infringe-

ment adjudicated within its borders when alleged infringing activity is taking place here and in providing its residents, like Plaintiff Donnelly and Defendant R & S USA LP, with a forum for dispute resolution. *See Akro,* 45 F.3d at 1549.

Defendant R & S GmbH, having assisted its limited partnership in conducting business in Michigan by engaging in fairly significant involvement in the state, enjoyed the advantages of using its business goodwill with contacts in Michigan, instead of relying only on its limited partnership. Defendant R & S GmbH cannot now be heard to say that adjudicating a dispute in Michigan is unfair. (*See* Eberspaecher Dep. Tr., 46:12–20 (". . . You cannot do any business in the United States without an engineering office in Michigan. . . . Because the so-called 'Big Three' are located in Michigan.").) Therefore, the Court finds that exercise of specific personal jurisdiction over Defendant R & S GmbH comports with due process.

## B.   General Jurisdiction

■ The Due Process Clause also permits the exercise of general jurisdiction. "General jurisdiction exists when a defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims." *Aristech Chemical,* 138 F.3d at 627 (internal quotations omitted); *see also Red Wing Shoe,* 148 F.3d at 1359.

In the only applicable provision here, the Michigan statute covering general jurisdiction also uses the "continuous and systematic" language:

The existence of any of the following relationships between a corporation and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise general personal jurisdiction over the corporation and to enable such courts to render

personal judgments against the corporation. . . . (3) *The carrying on of a continuous and systematic part of its general business within the state.*

Mich. Comp. Laws § 600.711 (emphasis added). Therefore, in this matter, the test for the appropriate exercise of general personal jurisdiction is the same under Michigan's long-arm statute and federal due process. *See Michigan Nat'l Bank v. Quality Dinette, Inc.,* 888 F.2d 462, 464 (6th Cir.1989).

Beyond the contacts detailed in the section on specific jurisdiction, Defendant R & S GmbH has additional contacts with Michigan. These contacts include purchasing glass and garage door openers from Michigan suppliers; sending representatives to solicit business outside the United States; sending representatives to Michigan to oversee supply contract arrangements for supplies delivered outside the United States and used in products sold outside the United States; attending automobile trade shows in Michigan, like the Detroit Auto Show; and using Michigan choice-of-law clauses in shipments of components made to Tennessee.

The Supreme Court has held that a foreign corporation's helicopter purchases and related training for its employees in the forum state over a seven-year period were not sufficient to be "continuous and systematic" contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 409–15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Thus, Defendant R & S GmbH's acts of purchasing glass and door opener components from Michigan companies is not enough to subject it to general jurisdiction in Michigan. Of course, Defendant R & S GmbH's contact with the state is more extensive than the product purchase and related employee training involved in *Helicopteros Nacionales.* In fact, the *Helicopteros Nacionales* Court noted that

"[Helicol] never has performed helicopter operations in Texas or sold any product that reached Texas, never solicited business in Texas, never signed any contract in Texas, never had any employee based there, and never recruited an employee in Texas." *Id.* at 411, 104 S.Ct. 1868. Defendant R & S GmbH has solicited business in Michigan on behalf of itself and on behalf of Defendant R & S USA LP; had its employees stationed there to provide their specialized knowledge regarding product lines; and reached into Michigan to send samples and other forms of technical support to the limited partnership in Michigan in which it was a partner. Defendant R & S GmbH also set goals for Defendant R & S USA LP in Michigan and received monthly reports.

Further, the act of using a Michigan choice-of-law clause in some of its contracts, as it did in contracts whereupon Defendant R & S GmbH sent components to Tennessee, can be another indicator that a defendant has " 'purposely invoked the benefits and protections of a State's laws' for jurisdictional purposes," even if such a clause would be insufficient if it were the only contact with Michigan. *See Evans Tempcon,* 778 F.Supp. at 376–77 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 482, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The evidence suggests that at least 280 shipments of components made to Tennessee were governed by Michigan law under such choice-of-law clauses.

As to the placement of three of its employees in the state, cross-pollination of staffing is common and does not necessarily give rise to general jurisdiction. *See Dean v. Motel 6 Operating L .P.,* 134 F.3d 1269, 1274–75 (6th Cir.1998). In *Dean,* however, the employees left one corporate entity and joined another, whereas the employees in the instant case continued to be employed by Defendant R & S GmbH even while working at Defendant R & S USA LP. *Id.* at 1275. This gives rise to a very reasonable inference that those employees were in the forum for the benefit of Defendant R & S GmbH. Their presence constituted an attempt by Defendant R & S GmbH to avail itself of the forum.

Defendant R & S GmbH also argues that the presence of its employees in the state was too far in the distant, non-relevant past to constitute a relevant contact to this present action. However, the evidence available at this stage suggests that at least two of the employees worked at Defendant R & S USA LP for some part of the period from June 1998 to the present. Defendant R & S GmbH has not presented any evidence otherwise. The evidence simply does not indicate a sufficient break in the distant past which would constitute a deliberate attempt to abandon the state. These employees recently and during the time period relevant to this litigation continued to engage in the business of Defendant R & S GmbH, on the corporation's behalf, in the state of Michigan.

In addition, where the officers of a parent corporation have been reviewing and directing operations of a subsidiary in the forum state, the parent can be held to have purposely availed itself of the forum. *Third Nat'l Bank v. WEDGE Group, Inc.,* 882 F.2d 1087, 1090 (6th Cir.1989); *cf. Dean,* 134 F.3d at 1274 (discussing that where no evidence that parent took any affirmative action in operation of entity operating in forum, and no other forum contacts, there could not be a finding of purposeful availment). Defendant R & S GmbH has reviewed the operations of Defendant R & S USA LP and has set strategy and goals for R & S USA LP. This does not rise to the level of "directing" activities, in terms of having the same board members for both entities, etc., like were

present in *WEDGE Group. See WEDGE Group,* 882 F.2d at 1090. But Defendant R & S GmbH engaged in other activities found relevant in *WEDGE Group,* like negotiating with outside entities on behalf of the subsidiary in the state. *Id.* The level of direction activities aimed at Defendant R & S USA LP in Michigan, particularly when considered with the other factors present, is sufficient to render the contacts with the state "continuous and systematic."

Finally, Defendant R & S GmbH has had "continuous and systematic" contacts with Michigan through the delivery of its accused mirrors into the state. Defendant R & S GmbH argues that its sales of the accused mirrors to Mercedes in Germany cannot be sufficient to be "continuous and systematic" contacts, citing *Conti v. Pneumatic Prods. Corp.,* 977 F.2d 978 (6th Cir. 1992). *See Conti,* 977 F.2d at 981 (sales to a distributor inside the forum state for distribution in the forum state was not enough for "continuous and systematic" contacts in forum state). However, Federal Circuit law applies here, not Sixth Circuit law. Moreover, this Court has detailed the reasons why it believes that these sales of Defendant R & S GmbH constitutionally count as contacts in Michigan under relevant Federal Circuit and Supreme Court cases. Defendant R & S GmbH designed the accused mirrors in question for American markets and knew where they were headed. Those sales, in combination with Defendant R & S GmbH's other contacts in Michigan, lead this Court to the conclusion that exercise of general jurisdiction over Defendant R & S GmbH is authorized and constitutional.

## IV. Conclusion

The Court determines that it has both specific and general jurisdiction over Defendant R & S GmbH and thus will deny Defendant R & S GmbH's Motion. An order consistent with this opinion will be entered.

### ORDER

In accordance with an Opinion filed this day,

**IT IS HEREBY ORDERED** that Defendant Reitter & Schefenacker GmbH & Co. KG's Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 22) is **DENIED.**