**Reversed and Dismissed and Opinion Filed September 13, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-21-00267-CV

## FAR EAST MACHINERY CO., Appellant
## V.
## ISABEL ARANZAMENDI, INDIVIDUALLY AND AS WRONGFUL DEATH BENEFICIARY OF WILBER DIMAS, DECEASED, ET AL.,
## Appellees

**On Appeal from the County Court at Law No. 5
Dallas County, Texas
Trial Court Cause No. CC-18-05668-E**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Carlyle
Opinion by Justice Myers

Far East Machinery Co. brings this interlocutory appeal of the trial court's order denying its special appearance. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7). Far East Machinery brings one issue on appeal contending the trial court erred by denying its special appearance. We reverse the trial court's order and render judgment dismissing appellees' claims against Far East Machinery for lack of jurisdiction.

## BACKGROUND

### The Accident

In June 2018, a fire and natural gas explosion at a hospital construction site in Gatesville, Texas, injured and killed several people. Appellees[1] allege Far East Machinery, a Taiwanese corporation, manufactured steel pipe that was used to carry natural gas at the construction project. Natural gas is odorless. The odorant mercaptan is added to provide a rotten-egg smell so the gas can be easily detected. Appellees allege that the pipe manufactured by Far East Machinery had not been properly treated to resist adsorption or absorption of the odorant. Natural gas escaped into the construction area, the workers were not aware of it, and there was a fire and an explosion.

### The Sale of the Pipe

On April 22, 2016, Marubeni-Itochu Steel Canada, Inc., a company located in British Columbia, Canada, ordered pipe from Far East Machinery in Taiwan. The "Sales Contract" stated Marubeni was the "Buyer" and indicated All-Tex was the "Client." Two invoices from Far East Machinery were addressed to Marubeni and

---

[1] Appellees are the plaintiffs and plaintiff intervenors in the case below: Isabel Aranzamendi, individually and as beneficiary of Wilber Dimas, deceased; Pablo Morales Jaimes and Rosalina de Paz Puebla, as wrongful death beneficiaries of Filiberto Morales de Paz, deceased; Joel Tovar; Jorge Tovar; Victor Orozco; Abel Ponce Espinoza; Bethany Helen Morales, individually and as personal representative of the estate of Filiberto Morales de Paz, deceased; Rocio Guiterrez Diaz Deleon, as next friend of AMG, a minor; Jose Tovar; Aaron Haveron; Tonya Haveron; Richard Studer; Matthew Aaron; Rebecca Aaron, individually and on behalf of J.A. and S.A., minor children; Justin Barabas; Shelly Harwell; Vernon Barabas; Jessica Barabas; Jeffrey Barabas; Annette Romer, individually and on behalf of the estate of Michael Bruggman; Victor Orozco; Abel Ponce Espinoza; Jacob Rodriguez; Jose Antonio Reyes Torres; Nancy Shelton; and Matthew Lytle.

stated "Customer:  All-Tex."  The two invoices for the pipe totaled US$22,217.60.  The shipping term for the pipe was "CFR" to the Port of Houston.  "CFR" stands for "Cost of Freight" and means that the seller arranges and pays for the shipping of the cargo and that title and risk of loss passes when the cargo is loaded onto the ship at the port of export.  In September 2016, the pipe was loaded on a ship in Kaohsiung, Taiwan and was unloaded at the Port of Houston.  The documentation for the sale and shipment stated the pipe was "Manufactured, tolerance and tested with API 5LB PSLI satisfactory results in accordance with the requirement of the above material specification."

In December 2016 and September 2017, All-Tex received orders for pipe to be used in the Gatesville hospital project.  All-Tex filled the order using some of the pipe manufactured by Far East Machinery.

### The Litigation

After the fire and explosion at the construction site, the victims and their families brought suit against many defendants involved in the construction project including All-Tex and Far East Machinery.  Appellees alleged causes of action against Far East Machinery for strict products liability for marketing and manufacturing defects, negligence, gross negligence, and breach of implied warranty.

Far East Machinery filed a special appearance asserting it did not do business in Texas, it lacked minimum contacts with Texas, and that the court's assumption of

–3–

jurisdiction over it would offend traditional notions of fair play and substantial justice depriving it of due process. The trial court denied Far East Machinery's special appearance.

## SPECIAL APPEARANCE

Texas courts may exercise personal jurisdiction over a nonresident defendant "when the state's long-arm statute authorizes such jurisdiction and its exercise comports with due process." *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 (Tex. 2016). The Texas long-arm statute provides in relevant part that "[i]n addition to other acts that may constitute doing business," a nonresident does business in Texas if the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state, or if the nonresident commits a tort in whole or in part in this state. CIV. PRAC. § 17.042(1), (2). The statute "provides for personal jurisdiction that extends to the limits of the United States Constitution, and so federal due process requirements shape the contours of Texas courts' jurisdictional reach." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016).

"[W]hether a trial court's exercise of jurisdiction is consistent with due process requirements turns on two requirements: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[S]ufficient

–4–

minimum contacts exist when the nonresident defendant 'purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws.'" *Id.* at 67 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "The nub of the purposeful availment analysis is whether a nonresident defendant's conduct in and connection with Texas are such that it could reasonably anticipate being haled into court here." *Id.* at 67. "Purposeful availment involves contacts that the defendant 'purposefully directed' into the forum state." *Id.* (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)).

When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the contacts relied upon must be purposeful rather than random, isolated, or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Cornerstone*, 493 S.W.3d at 70–71. This analysis assesses the quality and nature of the contacts, not the quantity. *Moncrief Oil Int'l Inc v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013). A defendant will not be haled into a jurisdiction based solely on contacts that are random, isolated, or fortuitous, or on the unilateral activity of another party or a third person. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005); *Guardian Royal Exch.*, 815 S.W.2d at 226. In addition to minimum contacts,

due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Moncrief Oil*, 414 S.W.3d at 154 (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)).

The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant. *Searcy*, 496 S.W.3d at 66. Once the plaintiff has met this burden, the defendant then assumes the burden of negating all potential bases for personal jurisdiction that exist in the plaintiff's pleadings. *Id.* The defendant can negate jurisdiction on either a factual or legal basis. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). A defendant negates jurisdiction on a factual basis by presenting evidence to disprove the plaintiff's jurisdictional allegations. *Id.* "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id.* (footnotes omitted). A defendant negates jurisdiction on a legal basis by showing:

> [E]ven if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.*

"Minimum contacts with a forum state give rise to either general or specific jurisdiction." *Vinmar Overseas Sing. PTE Ltd. v. PTT Int'l Trading PTE Ltd.*, 538 S.W.3d 126, 131 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *see also KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 392 (Tex. App.—Dallas 2012, no pet.). "A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the state." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024 (2021). An individual is subject to general jurisdiction in the state where the person is domiciled. *Id.* (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). The equivalent of a domicile for a corporation are its place of incorporation and its principal place of business. *Id.*

Far East Machinery is a corporation organized under the laws of Taiwan, and its principal place of business is in Taiwan. Chien Hsing Liu, Far East Machinery's deputy manager, testified that Far East Machinery is not registered with the Texas Secretary of State, has not been authorized to conduct business in Texas, has never conducted business in Texas, and has not held itself out as doing business in Texas. Thus, Far East Machinery established it is not "essentially at home" in Texas. Appellees do not assert that general jurisdiction applies to Far East Machinery, and we conclude Far East Machinery is not subject to general jurisdiction.

Our inquiry is therefore limited to specific jurisdiction, which is based on "whether the defendant's activities in the forum state themselves 'give rise to the liabilities sued on.'" *Searcy*, 496 S.W.3d at 67 (quoting *Int'l Shoe*, 326 U.S. at 317).

Specific jurisdiction exists when the plaintiff's claims "arise out of" or are "related to" the defendant's contacts with the forum. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984)). "In sum, specific personal jurisdiction over a nonresident defendant requires the defendant's purposeful availment of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. It also requires a 'substantial connection' between those activities and the operative facts of the litigation." *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 890 (Tex. 2017) (citation omitted). "[T]he *defendant's* relationship, not the *plaintiff's* relationship, with the forum state is the proper focus of the specific jurisdiction analysis; that is, courts must consider the relationship between the defendant, the forum state, and the litigation." *Searcy*, 496 S.W.3d at 67. "The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.) (quoting *Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.)).

As a question of law, we review de novo whether a trial court has personal jurisdiction over a nonresident defendant. *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). Resolving this question of law, though, may require a court to decide questions of fact. *Id.* When, as here, the court does not issue findings of fact for its special-appearance decision, we presume that all factual

disputes were resolved in favor of the court's decision, and we imply all relevant facts necessary to support the judgment that are supported by the evidence, unless they are challenged on appeal. *See id.*; *M & F Worldwide Corp. v. Pepsi–Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017).

## ANALYSIS

In its sole issue on appeal, Far East Machinery contends the trial court erred by denying its special appearance.

Appellees had the burden of pleading sufficient allegations to permit a court's exercise of personal jurisdiction over a nonresident defendant. *Searcy*, 496 S.W.3d at 66. They met this requirement by pleading Far East Machinery "is engaged in business in the State of Texas." *See Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 126, 129 (Tex. App.—Dallas 2021, no pet.) (en banc). The burden then shifted to Far East Machinery to negate all potential bases for personal jurisdiction that exist in the plaintiff's pleadings. *Searcy*, 496 S.W.3d at 66.

In a products liability case, there is specific personal jurisdiction if the case meets the stream-of-commerce theory and there is a "plus" factor. The Supreme Court of Texas has discussed how specific jurisdiction arises in lawsuits involving a product manufactured by a foreign defendant that causes injury in Texas:

> Under our stream-of-commerce-plus precedent, specific jurisdiction exists if the defendant places goods into the stream of commerce with the expectation that they will be purchased by consumers in the forum state. The exercise of jurisdiction is permitted, however, only when the defendant targets the forum, not when the defendant merely foresees his product ending up there. In resolving questions of specific

jurisdiction, we look both to the defendant's conduct and the economic realities of the market the defendant seeks to serve.

*Luciano*, 625 S.W.3d at 13 (citations and internal quotation marks omitted). "[S]howing that the defendant placed the product in the stream of commerce is not alone sufficient to establish purposeful availment; some additional conduct or 'plus factor'—such as design for use in the target market—must also be shown." *In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 679 (Tex. 2022) (per curiam) (citing *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 112 (1987));[2] *see also LG Elecs., Inc. v. Lovers Tradition*

---

[2] Justice O'Connor wrote in the plurality portion of the opinion:

> Other courts, however, have understood the Due Process Clause to require something more than that the defendant was aware of its product's entry into the forum State through the stream of commerce in order for the State to exert jurisdiction over the defendant. In the present case, for example, the State Court of Appeal did not read the Due Process Clause, as interpreted by *World-Wide Volkswagen,* to allow "mere foreseeability that the product will enter the forum state [to] be enough by itself to establish jurisdiction over the distributor and retailer." App. to Pet. for Cert. B5. In *Humble v. Toyota Motor Co.,* 727 F.2d 709 (8th Cir 1984), an injured car passenger brought suit against Arakawa Auto Body Company, a Japanese corporation that manufactured car seats for Toyota. Arakawa did no business in the United States; it had no office, affiliate, subsidiary, or agent in the United States; it manufactured its component parts outside the United States and delivered them to Toyota Motor Company in Japan. The Court of Appeals, adopting the reasoning of the District Court in that case, noted that although it "does not doubt that Arakawa could have foreseen that its product would find its way into the United States," it would be "manifestly unjust" to require Arakawa to defend itself in the United States. *Id.,* at 710–711, quoting 578 F. Supp. 530, 533 (N.D. Iowa 1982). *See also Hutson v. Fehr Bros., Inc.,* 584 F.2d 833 (8th Cir. 1978); *see generally Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 299 (3d Cir. 1985) (collecting "stream of commerce" cases in which the "manufacturers involved had made deliberate decisions to market their products in the forum state").
>
> We now find this latter position to be consonant with the requirements of due process. The "substantial connection," *Burger King,* 471 U.S., at 475,; *McGee,* 355 U.S., at 223, between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State. Burger King, supra,* 471 U.S. at 476; *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984). The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum

*II, LP*, No. 05-19-01304-CV, 2020 WL 4281965, at *11–14 (Tex. App.—Dallas July 27, 2020, pet. dism'd) (discussing the difference between the rejected "stream of commerce" theory and the accepted "stream-of-commerce-plus" theory).  In *Asahi*, Justice O'Connor described the "additional conduct" indicating an intent or purpose to serve the forum state as including:  "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  *Asahi*, 480 U.S. at 113.

In this case, Marubeni ordered the pipe from Far East Machinery and identified its customer as All-Tex.  Far East Machinery agreed with Marubeni to ship

---

State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.  But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

Assuming, *arguendo,* that respondents have established Asahi's awareness that some of the valves sold to Cheng Shin would be incorporated into tire tubes sold in California, respondents have not demonstrated any action by Asahi to purposefully avail itself of the California market.  Asahi does not do business in California.  It has no office, agents, employees, or property in California.  It does not advertise or otherwise solicit business in California.  It did not create, control, or employ the distribution system that brought its valves to California.  *Cf. Hicks v. Kawasaki Heavy Indus tries,* 452 F. Supp. 130 (M.D. Pa. 1978).  There is no evidence that Asahi designed its product in anticipation of sales in California.  *Cf. Rockwell International Corp. v. Costruzioni Aeronautiche Giovanni Agusta,* 553 F. Supp. 328 (E.D. Pa.1982).  On the basis of these facts, the exertion of personal jurisdiction over Asahi by the Superior Court of California exceeds the limits of due process.

*Asahi*, 480 U.S. at 111–13 (footnote omitted).  Texas follows this analysis.  *Luciano*, 625 S.W.3d at 10.

–11–

the pipe CFR to the Port of Houston. Far East Machinery was aware that All-Tex was Marubeni's customer.

Far East Machinery's deputy manager, Chien Hsing Liu, testified in his affidavit that Far East Machinery:

> is not registered with the Texas Secretary of State, has not been authorized to conduct business in Texas, and has not held itself out as doing business in Texas;

> has never maintained an office, warehouse, place of business, or any other real property in the State of Texas;

> have never owned, leased, rented, or controlled any personal property in the State of Texas;

> has never had a mailing address, telephone listing or bank account in the State of Texas;

> has never solicited or conducted business in the State of Texas;

> has never had any ownership interest in any business that that is based in or conducts business in the State of Texas;

> does not have distribution or sales agreements with any individual or corporate entity based in the State of Texas;

> has never sent any of its officer, agents, servants, or employees to the State of Texas to solicit or conduct business. I have been to Texas one time per year, but no business is conducted during these trips;

> has never executed a contract in the State of Texas or with a Texas resident or corporate entity;

> does not advertise in the United States or maintain a website targeting Texas businesses;

> has never had a channel for providing regular advice to users or buyers of products in Texas;

> has no business relationship with All-Tex;

has no knowledge of and does not control how or where the products are further sold, shipped and distributed within the United States by All-Tex once the product arrives at the Houston port;

is not informed who All-Tex's customers are, where the ultimate customers are located within the United States and whether the pipe's application is for gas, oil, or water.

Far East Machinery denied having awareness that the product might be used in Texas and denied having control over its final destination. However, "'[r]easonable expectation,' and not 'right of control,' is the controlling issue under the stream of commerce doctrine." *Kawasaki Steel*, 699 S.W.2d at 201.

In this case, the trial court could find Far East Machinery had a reasonable expectation that at least some of the pipe would enter Texas and be used in Texas. The trial court could consider "the economic realities of the market" Far East Machinery sought to serve. *Luciano*, 625 S.W.3d at 13. Far East Machinery knew the pipe was to be shipped to the Port of Houston in Texas, and it knew Marubeni's customer was All-Tex, Inc., which has all its offices in Texas. Texas is well known to be one of the largest oil and gas producers, refiners, and users in the United States, and thus has a proportional need for pipe to transport those products. Although Far East Machinery could not be one-hundred percent certain that any of the pipe it manufactured and had shipped to the Port of Houston for All-Tex would be used in Texas, it presented no evidence that it had reason to believe the pipe would not be used in Texas. Based on this evidence, the trial court could find there was a reasonable expectation that some of the pipe would be used in Texas.

A reasonable expectation that the product will be used in Texas is not sufficient to meet the requirements of due process; there must be additional conduct—a "plus" factor—"evincing 'an intent or purpose to serve the market in the forum State.'" *Luciano*, 625 S.W.3d at 10 (quoting *Asahi*, 480 U.S. at 112). Examples of such conduct may include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi*, 480 U.S. at 112; *see also Luciano*, 625 S.W.3d at 10 ("Evidence of such additional conduct may include advertising in the forum state, soliciting business through sales persons, or creating, controlling, or employing the distribution system that brought the product into the forum state." (citations omitted)).

We next consider whether Far East Machinery met the "plus" factor of conduct evincing an intent or purpose to serve the Texas market. Appellees alleged Far East Machinery's contacts with Texas are:

> arranging for the shipping of its products to the Port of Houston;
>
> some or all of the pipe was marked "FEMCO HOUSTON TX" and Far East Machinery's deputy manager admitted Far East Machinery marked the pipe "FEMCO";
>
> Far East Machinery has a website accessible in Texas advertising that its products meet certain standards of the American Petroleum Institute, and Far East Machinery stated on the sales documentation that the pipe had been tested and met those specifications;

Far East Machinery has been involved in litigation in federal court in the Eastern District of Texas; and

Far East Machinery's deputy manager travels to Texas once a year.

**Shipping Product to Texas**

Appellees assert that the allegedly defective pipe in this case manufactured by Far East Machinery was shipped to Texas. The record shows Far East Machinery did not contract with anyone in Texas; its contract was with Marubeni Canada, and Marubeni's Taiwanese office ordered the pipe from Far East Machinery. The record does not show whether All-Tex asked Marubeni for Far East Machinery's pipe or whether Marubeni decided unilaterally to fill the order with Far East Machinery's pipe. Although Far East Machinery arranged and paid for the shipping of the pipe to the Port of Houston, under the CFR shipping term (discussed below), title to the pipe and risk of loss for the pipe passed in Taiwan, and Far East Machinery's responsibility for the pipe ceased when the pipe was loaded onto the ship in Taiwan.

Appellees point to the fact that a significant amount of Far East Machinery's product is shipped to the Port of Houston, particularly in 2018, the year of the accident. Chien Hsing Liu's affidavit shows the percentage of Far East Machinery's product shipped to the United States and the percentage of its product shipped to the Port of Houston:

| Year | Percentage of product shipped to US | Percentage of product shipped to Port of Houston |
|------|-------------------------------------|---------------------------------------------------|
| 2016 | 26% | 7.5% |

| 2017 | 18% | 6.8% |
|---|---|---|
| 2018 (year of accident) | 32% | 11% |
| 2019 | 22% | 5.5% |
| 2020 (through Nov. 6) | 11% | 2.8% |

However, the mere fact that up to eleven percent of Far East Machinery's annual production was shipped to the Port of Houston is not evidence of actions in Texas or actions targeting Texas. Mere knowledge that Texas was the intended destination of the pipe is insufficient to subject Far East Machinery to personal jurisdiction without evidence that it "took additional steps to serve the Texas Market." *Luciano*, 625 S.W.3d at 13 (citing *CMMC v. Salinas*, 929 S.W.2d 435, 439 (Tex. 1996)); *see also LG Elecs., Inc.*, 2020 WL 4281965, at *12 ("personal jurisdiction depends not on whether LGE placed the HVAC systems into the steam of commerce knowing that they might end up in Texas . . . but instead on whether LGE engaged in any 'additional conduct' with Texas sufficient to purposefully avail itself of the benefits and protections of Texas laws"). Also, the record contains no evidence of the shipping terms of the other shipments and whether those shipments constitute contact with Texas by Far East Machinery. Evidence that Far East Machinery sold pipe that was shipped to the Port of Houston, including the order from Marubeni for All-Tex, "is not—without more—evidence of its purposeful availment of Texas." *Luciano*, 625 S.W.3d at 13.

### Shipping the Pipes "CFR"

Appellees point out that Far East Machinery shipped the pipe to the Port of Houston "CFR," which stands for "cost and freight." Appellees assert that fact supports the court's exercise of jurisdiction over Far East Machinery.

Black's Law Dictionary defines "cost and freight" shipping:

> **cost and freight.** A mercantile-contract term allocating the rights and duties of the buyer and the seller of goods with respect to delivery, payment, and risk of loss, whereby the seller must (1) clear the goods for export, (2) arrange for transportation by water, and (3) pay the costs of shipping to the port of destination. ● When the goods are safely stowed on the receiving ship while docked, the seller's delivery is complete; the risk of loss then passes to the buyer. This term is used only when goods are transported by sea or inland waterway.

*Cost and Freight*, BLACK'S LAW DICTIONARY (8th ed. 2004).[3] The Fifth Circuit has described CFR shipping thus: "Shipments designated 'CFR' require the seller to pay the costs and freight to transport the goods to the delivery port, but pass title and risk of loss to the buyer once the goods 'pass the ship's rail' at the port of shipment." *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 338 (5th Cir. 2003).

---

[3] In their brief on appeal, appellees cite this definition of CFR from searates.com:

> The seller pays for the carriage of the goods up to the named port of destination. Risk transfers to buyer when the goods have been loaded on board the ship in the country of Export. The Shipper is responsible for origin costs including export clearance and freight costs for carriage to named port. The shipper is not responsible for delivery to the final destination from the port (generally the buyer's facilities), or for buying insurance. If the buyer does require the seller to obtain insurance, the Incoterm CIF should be considered. CFR should only be used for non-containerized seafreight and inland waterway transport; for all other modes of transport it should be replaced with CPT.

https://www.searates.com/reference/incoterms/cfr/ (last visited Sept. 13, 2022).

Under CFR shipping, Far East Machinery arranged and paid for shipping the pipe to the Port of Houston, and title and the risk of loss passed to All-Tex when the pipe was loaded on board the ship in Taiwan. *See id.* Appellees assert the CFR term meant Far East Machinery "controlled the distribution of their pipes in Texas at least until they were offloaded at the Port of Houston." However, appellees have presented no authority that Far East Machinery had any legal control of the pipe or duty concerning the pipe after it was loaded on the ship in Taiwan. According to the definitions of cost-and-freight shipping quoted above, when the pipe was stowed on the ship in Taiwan, Far East Machinery's delivery was complete, and title and risk of loss passed to either Marubeni or All-Tex. *Id.* Nothing in the record shows Far East Machinery had any control over the distribution of the pipe after it was stowed in the ship in Taiwan. Appellees have not cited any authority establishing that Far East Machinery's responsibility for the pipe extended beyond the loading of the pipe onto the ship in Taiwan. The record does not show that Far East Machinery's shipping the pipes CFR constituted contact by Far East Machinery with Texas or evince an intent to serve the Texas market.

**Markings on the Pipe**

Appellees point out that a photograph of pipe found after the accident showed the pipe was marked "FEMCO" and "HOUSTON TX." Far East Machinery admitted that it marked "FEMCO" on the pipe. The invoices and packing lists state the "MARKS & NOS." would be:

FEMCO
P.O.NO.P1268188
HOUSTON, TX
SIZE:
NET WEIGHT:
GROSS WEIGHT:
NO.
PCS/BUNDLE
MADE IN TAIWAN
R.O.C.

The "P.O. NO." is the "customer's" purchase order number, and the "customer" was All-Tex. The fact that these marks are listed on Far East Machinery's invoice and packing list indicate Far East Machinery marked "HOUSTON TX" on the pipe. The "sales contract" does not state that Marubeni or All-Tex required any marks on the pipe. Appellees argue Far East Machinery's marking the pipe "HOUSTON TX" constituted Far East Machinery targeting the Texas market.

Appellees cite *In re Chinese-Manufactured Drywall Products Liability Litigation*, 753 F.3d 521 (5th Cir. 2014). After Hurricanes Katrina and Rita, there was a demand for drywall in the affected areas. *Id.* at 526. Chinese manufacturers of drywall imported their product to the United States to meet that need. *Id.* Numerous homeowners experienced problems with the imported drywall and brought suit against the Chinese manufacturers. *Id.* at 526–27. Two related Chinese companies, TG and TTP known collectively as Taishan, objected to jurisdiction and filed special appearances. *Id.* at 527. The Fifth Circuit concluded the exercise of personal jurisdiction over Taishan would be proper. *Id.* at 542–43. Appellees point

–19–

to the court's discussion that Taishan had "specifically altered its products to suit the forum state by marking its packaging 'Tampa,' stamping a Florida phone number on the packaging, and marking its drywall with a certification that it met or exceeded American standards." *Id.* at 542.

Appellees argue there is similar alteration of products "to suit the forum state" because Far East Machinery marked the pipe "Houston, TX." However, there is no evidence of why Far East Machinery placed those marks on the pipe. The sales contract did not require the marks. Nothing in the record indicates that All-Tex required those marks. No evidence shows Far East Machinery marked the pipes "Houston TX" "to suit the forum state." *See id.* In *In re Chinese Manufactured Drywall*, however, the evidence showed Taishan "would stamp it for the customer." *Id.* Moreover, the marking and packaging of the drywall was not the main reason the Fifth Circuit concluded Taishan had targeted Florida. The court pointed out that "Taishan entered into a sole agency agreement with a Florida company to sell its products and arranged the shipping of its drywall to Florida." *Id.* at 541. In its concluding paragraph of the discussion of the stream-of-commerce-plus theory, the court discussed the fact that Taishan had actively sought business in Florida by entering into a sales agreement with a Florida company to sell its drywall and that it wished to expand its sales in the United States through the Florida company. *Id.* at 542. The concluding paragraph summarizing the reasons for finding personal jurisdiction made no mention of the alteration of the product. *See id.* Thus, it

–20–

appears the alteration of the product was a lesser reason for finding purposeful availment. The opinion does not support finding the marking of "Tampa" on the drywall, standing alone, would have been conduct evincing an intent or purpose to serve the Florida market.

We conclude the mere fact that the pipes have "Houston, TX" marked on them is not sufficient to show Far East Machinery "took additional steps to serve the Texas market." *See Luciano*, 625 S.W.3d at 13.

Appellees also cite *Donnelly Corp. v. Reitter & Schefenacker GmbH & Co. KG*, 189 F. Supp. 2d 696 (W.D. Mich. 2002), which concerned a patent-infringement case against a German manufacturer of rear-view mirrors. Some of the mirrors made by the manufacturer were designed specifically to comply with American federal regulations and were labeled "USA" to alert Mercedes Benz that the mirrors were for installation in cars destined for sale in the United States. *Id.* at 708. However, the court noted that to comply with J. O'Connor's version of the stream-of-commerce theory, which is the version applied in Texas, there would have to be additional conduct purposely directing the mirrors for sale into a particular American state. *Id.* The judge in that case, however, applied Justice Brennan's version of the theory, which did not require the additional evidence, and concluded the manufacturer's "placement of the accused mirror into the American stream of commerce was such that Defendant R & S GmbH had to expect that being subject to suit in Michigan was possible." *Id.*

*Donnelly* is distinguishable for several reasons. The record does not show marking "Houston TX" on the pipes was done to benefit the purchaser, like the manufacturer in *Donnelly* labeling the mirrors "USA" to alert Mercedes that the mirrors should only be placed in vehicles bound for sale to the United States. *See id.* And, the court in *Donnelly* applied Justice Brennan's stream of commerce theory, not Justice O'Connor's, which is the stream-of-commerce theory applied in Texas. *See Luciano*, 625 S.W.3d at 10 (Texas courts follow J. O'Connor's version of the stream-of-commerce theory in *Asahi*).

Appellees mentioned at oral argument *Semperit Technische Produkte Gesellschaft M.B.H. v. Hennessy*, 508 S.W.3d 569 (Tex. App.—El Paso 2016, no pet.). In that case, a European high-pressure hose manufacturer, STP, sold a hose through its primary distributor in North America to a sub-tier distributor, Mid West, located in Oklahoma, which targeted Texas customers and sold the hose to a Texas company. STP manufactured the hose to include Mid West's markings so Mid West could sell the hose as its own brand. *Id.* at 573. The El Paso Court of Appeals stated, "The branding of the hose for a sub-tier distributor which targets Texas demonstrates purposeful availment of the Texas marketplace . . . ." *Id.* at 580. The courts found the marking of the hose in that case demonstrated purposeful availment. *Id.* In this case, there is no evidence that Far East Machinery marked "Houston TX" on the pipe at the request of All-Tex. The evidence does not support finding that the

marking on the pipe evinced an intent to serve the Texas market.  *See Luciano*, 625 S.W.3d at 10.

### Far East Machinery's Website

Appellees point to evidence that Far East Machinery has a website advertising that its pipe meets certain standards of the American Petroleum Institute and the American Society for Testing Materials.  Nothing in the record shows those standards are unique to Texas.  The evidence that the pipe meets certain standards may show Far East Machinery targets the United States and other countries that require the same certifications, but it is not evidence that Far East Machinery targets Texas.  *See CMMC*, 929 S.W.2d at 439 (manufacturer's wiring product for use in the United States was not sufficient to subject manufacturer to jurisdiction of Texas courts).

The portions of Far East Machinery's website that are in the summary judgment record do not mention Texas.  The only interactivity Far East Machinery's website appears to have is a page permitting the reader to leave a written message for the company.  No evidence shows that feature has been utilized by anyone from Texas or that Far East Machinery has responded to any requests from Texans using that feature.  The website does not allow a customer to place an order from the website.  Nothing shows the website evinces an intent by Far East Machinery to serve the Texas market.  *See Luciano*, 625 S.W.3d at 10.  There also is no substantial connection between the website and the operative facts of this litigation.  *See Moki*

–23–

*Mac*, 221 S.W.3d at 585 (for defendant's contacts to support specific jurisdiction "there must be a substantial connection between those contacts and the operative facts of the litigation").

### Far East Machinery's Previous Litigation in Texas

Appellees also point to evidence that Far East Machinery has been involved in litigation in the United States and in Texas. Far East Machinery was involved in litigation in the United States Court of International Trade concerning an antidumping order issued by the Department of Commerce. *See Far E. Machinery Co., Ltd. v. United States*, 699 F. Supp. 309 (U.S. Ct. Int'l Trade 1988); *Far E. Machinery Co., Ltd. v. United States*, 688 F. Supp. 610 (U.S. Ct. Int'l Trade 1988). Appellees inform us that Far East Machinery was also involved in litigation in state court in California but that there was no opinion from that case because it settled. These cases do not concern Far East Machinery reaching out to the Texas market or attempting to serve the Texas market. Nor do they constitute contact with Texas. Nor is there a substantial connection between than litigation and the operative facts of the litigation in this case. *See Moki Mac*, 221 S.W.3d at 585 (for defendant's contacts to support specific jurisdiction "there must be a substantial connection between those contacts and the operative facts of the litigation").

Appellees also point to evidence that Far East Machinery was a defendant in a case in the Eastern District of Texas. *See Jackson v. U.S. Kids Golf*, No. 4:06-cv-00237; 2006-30124-211, 2009 WL 2589545 (E.D. Tex. Apr. 24, 2009) (verdict and

settlement summary). In that case, a child was using a U.S. Kids golf club. The club broke, and the child fell on the shaft puncturing his carotid artery and died. The child's parents sued numerous companies, including Far East Machinery, which allegedly manufactured the steel used for the club's shaft. The verdict summary states Far East Machinery "denied the allegations," which indicates it did not file a special appearance. *Id.* The jury found the child was 100 percent negligent and that there was no defect in the design or manufacture of the club. *Id.* The judge "entered judgment in accord with the verdict." *Id.* This contact with Texas by Far East Machinery defending itself in court does not indicate any commercial activity by it in Texas or any intent to serve the Texas market. Appellees state it shows a tendency by Far East Machinery's deputy manager to deceive because, as appellees assert, his affidavit "was written with great care to avoid mention of this prior lawsuit in Texas" because the affidavit stated, "Far East Machinery Company, Ltd. has never been sued in the State of Texas state courts." Regardless, however, the lawsuit does not demonstrate that Far East Machinery took any step to serve the Texas market. There also is no substantial connection between the lawsuits and the operative facts of this litigation. *See Moki Mac*, 221 S.W.3d at 585 (for defendant's contacts to support specific jurisdiction "there must be a substantial connection between those contacts and the operative facts of the litigation").

### Far East Machinery's Deputy Manager's Travel to Texas

Appellees also point out that Far East Machinery's deputy manager, Chien Hsing Liu, travels to Texas every year. Chien Hsing Liu stated in his affidavit that Far East Machinery "has never sent any of its officers, agents, servants, or employees to the State of Texas to solicit or conduct business. I have been to Texas one time per year, but no business is conducted during these trips." He answered Far East Machinery's answers to interrogatories about the trips and stated he traveled to Houston in 2016, 2017, and 2019 as the guest of Geneva Trading Co., Shin Okura Trading Co., Ltd., and Steelcom Pipe International, LLC. He stated he "was introduced to various clients of these trading companies," he did not conduct any business on these trips, and he had never conducted any business with those companies.

None of this evidence shows Far East Machinery had any contact with All-Tex or that Far East Machinery tried to serve the Texas Market such as through sales promotions, market research, or after-sales service to customers. *Cf. Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985) (per curiam) ("Kawasaki maintained an office in Houston that provided sales promotion, marketing research, and after-sales service to Kawasaki's customers in North America and Mexico."). There also is no substantial connection between the deputy manager's travels to Texas and the operative facts of this litigation. *See Moki Mac*, 221 S.W.3d at 585.

(for defendant's contacts to support specific jurisdiction "there must be a substantial connection between those contacts and the operative facts of the litigation").

## Agents Listed on the Bills of Lading

Appellees also assert three bills of lading show Far East Machinery had agents in Houston to complete delivery of the pipes to All-Tex.

A bill of lading from SK Shipping states the pipe was shipped on the Asia Emerald II. The pipe was "Laden on Board the Vessel" on September 23, 2016, the Port of Loading was Kaohsiung, Taiwan, and the Port of discharge was "Houston, TX." Section 3 of the bill of lading is headed "Notify party" and then states:

> LIVINGSTON INTL, INC. / M.G. MAHER
> & CO INC. 801 TRAVIS ST. SUITE
> 1450 HOUSTON, TX 77002

Nothing in the record indicates who Livingston International was or that it was Far East Machinery's agent. In response to appellees' request for admissions, Far East Machinery denied it had hired Livingston International "to represent it in connection with import of the steel pipe."

Section 9 of SK Shipping's bill of lading is headed "Marks and Numbers" and states:

> HOUSTON AGENT:
> NORTON LILLY INTERNATIONAL
> 3120 SOUTHWEST FREEWAY SUITE 615
> HOUSTON, TX 77098

This document indicates the "Marks and Numbers" included the Houston agent Norton Lilly International. Nothing indicates who required the Marks and Numbers

–27–

to include "Houston Agent: Norton Lilly International." The document gives no indication of the identity of Norton Lilly International's principal. In response to appellees' request for admissions, Far East Machinery denied it had hired Norton Lilly "to represent it in connection with import of the steel pipe."

The bill of lading from CYCLE WIDE SHIPPING INC. states:

Frefreight and charges
HOUSTON AGENT:
SEA MARK MANAGEMENT INC., NEW JERSEY
100 LIGHTING WAY, 4TH FLOOR, SECAUCUS NEW JERSEY
07094, U.S.A.

The record contains no evidence of what "Frefreight and charges" are or who Sea Mark Management's principal is.

A bill of lading from DAEWOO Logistics Corp. contains contractual provisions and then lists an agent:

IN ACCEPTING THIS BILL OF LADING, THE SHIPPER, OWNER AND CONSIGNEE OF THE GOODS AND HOLDER OF THE BILL OF LADING EXPRESSLY ACCEPT AND AGREE TO ALL ITS STIPULATIONS EXCEPTIONS AND CONDITIONS, WHETHER WRITTEN, STAMPED OR PRINTED AS FULLY AS IF SIGNED BY SUCH SHIPPER, OWNER, CONSIGNEE AND/OR HOLDER. No agent is authorized to waive any of the provisions of the within clauses.

RECEIVED from the shipper herein named the goods or packages said to contain goods . . . in apparent good order and condition . . . to be transported from the port of loading with liberty to proceed . . . to the port of discharge . . . .

. . . .

IN WITNESS WHEREOF, THE MASTER OF AGENT OF THE SAID SHIP HAS SIGNED TO THREE (3) bills of lading, all of this

–28–

tenor and date. ONE of which being accomplished, the others to stand void . . . .

HOUSTON AGENT:
Blue Water Shipping Co.
17625 El Camino Real — STE 120 Houston, Texas 77058

Again, the record contains no evidence for whom Blue Water Shipping Co. is an agent. The paragraph above the name "Blue Water Shipping Co." states "THE MASTER OF AGENT OF THE SAID SHIP" signed three bills of lading, which indicates Blue Water Shipping Co. may be the "AGENT OF THE SAID SHIP." Nothing indicates Blue Water Shipping Co. is Far East Machinery's agent.

None of the bills of lading indicate they were prepared by Far East Machinery, and none of them indicate that Far East Machinery was the principal of the agents listed on the bills of lading. Appellees assert the agents were "Houston-based shipping and customs agents." Appellees do not explain why Far East Machinery needed shipping and customs agents in Houston. Under the CFR shipping term, Far East Machinery completed its delivery of the pipe when the cargo was loaded onto the ship in Taiwan, so Far East Machinery had no responsibility at the Port of Houston or in Texas for the shipping and customs in Texas and thus had no need of agents in Houston to expedite getting the pipes through customs and delivered to Marubeni's customer, All-Tex. Appellees' assertion that the listed agents were Far East Machinery's agents has no support in the record.

## Cases Cited by the Parties

Appellees cite *Luciano v. SprayFoamPolymers, LLC* as supporting the exercise of jurisdiction over Far East Machinery. In *Luciano*, a Connecticut manufacturer, SprayFoam, was sued when its product was used in a Texas home. *Luciano*, 625 S.W.3d at 6. The supreme court found purposeful availment by SprayFoam because it had a distribution center in Texas "to handle logistics for its products in Texas." *Id.* at 10. SprayFoam also had an "independent contractor sales representative," Preston Nix, in Colorado whose service area included Texas. *Id.* at 7. SprayFoamPolymers relied on Nix as its sales agent and paid him commissions on his sales. *Id.* at 12. As the supreme court said, "Put plainly, his job was to 'find customers.'" *Id.* at 11. The court concluded, "Placing its product into the stream of commerce in conjunction with its 'additional conduct' of soliciting business and distributing its product in Texas is sufficient to hold that SprayFoam purposefully availed itself of the Texas market." *Id.* at 14; *see also id.* at 18 ("Here, SprayFoam's actionable conduct involved allegedly causing injury in Texas to Texas residents. Additional conduct that it tapped into the Texas market is evinced by its use of a Texas distribution center and a Texas sales representative to create a market to sell to local installers."). In this case, there is no evidence that Far East Machinery has a sales representative, a distribution center, or their equivalent targeting Texas.

Appellees also cite *Benxi Northern Steel Pipe Co., Ltd. v. Atlas Tubular, L.P.*, No. 13-13-00102-CV, 2013 WL 6573782 (Tex. App.—Corpus Christi–Edinburg

2013, no pet.) (mem. op.). Benxi was a Chinese steel pipe manufacturer. *Id.* at *1. It received an order from another Chinese company, Shanghai, for pipe to be shipped to the Port of Houston for Shanghai's customer, CMC Dallas, which was a Texas corporation. *Id.* Benxi manufactured the pipe specifically for CMC Dallas's order. *Id.* at *1. Benxi made quality assurances that the pipe was appropriate for purchase and use in a Texas-centered oil-field application, and Benxi agreed to perform hydrostatic tests of the pipe to meet certain standards. *Id.* at *11. CMC Dallas had encountered testing failures by Benxi in the past. Before placing the orders at issue, CMC Dallas's personnel traveled to China and met with Benxi to make sure the pipe was properly tested. The pipe was shipped to the Port of Houston. The pipe was not used in a Texas-centered oil field. Instead, CMC Dallas sold the pipe through other intermediaries before it was finally purchased and installed in an underwater pipeline off the coast of Alabama. Despite Benxi's promise that the pipe was tested and met certain specifications, Benxi had not tested the pipe and it failed, causing damage. *Id.* In the subsequent lawsuit, the trial court denied Benxi's special appearance, and the court of appeals affirmed, concluding Benxi "purposefully directed acts towards Texas or purposefully availed itself of the benefits and protections of Texas law." *Id.* at *4.

*Benxi* is not analogous to the case before us. Benxi manufactured the pipe for CMC Dallas after it received CMC Dallas's order; there is no evidence Far East Machinery manufactured the pipe specifically for Marubeni's order from All-Tex or

–31–

that it manufactured the pipe after receiving the order. Benxi's employees met with CMC Dallas's employees to assure them the pipe would be properly tested. *Id.* In this case, there is no evidence that Far East Machinery's employees had any contact with All-Tex. Benxi made "specific quality assurances . . . that the pipe was hydrostatically tested, met specifications, and was for purchase and use in a Texas-centered oil field application." *Id.* In this case, Far East Machinery made quality assurances that the pipe met certain specifications of the American Petroleum Institute, but it made no representations of standards specific to Texas. CMC Dallas received a Benxi catalog showing Dallas was the "sole point of international sales to the United States," *id.* at *1, but no evidence shows Texas is the sole point of Far East Machinery's sales in the United States or that Far East Machinery sent a catalog to All-Tex or anyone else in Texas. The court in *Benxi* observed that "[s]ellers who create 'continuing relationships and obligations with citizens of another state' are subject to jurisdiction based on their activities in the forum state." *Id.* at *8 (quoting *Michiana*, 168 S.W.3d at 785). The court concluded that Benxi had created such relationships with Texas citizens by meeting multiple times with CMC Dallas in China to discuss purchases, sales, quality, testing, and the suspension of CMC Dallas's purchases due to Benxi's lack of testing." *Id.* In this case, there is no evidence of any communication directly between Far East Machinery and All-Tex, and Chien Hsing Liu testified that Far East Machinery "has no business relationship with All-Tex." No evidence shows Far East Machinery created continuing

–32–

relationships and obligations with citizens of Texas by filling the order from Marubeni and arranging for the pipe to be shipped to the Port of Houston. *Benxi* is too dissimilar to be applicable to this case.

Appellees also cite *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021). Appellees assert, "Just as Ford is liable for defects in vehicles in a state where Ford never did anything causing the problem, or even sold the vehicle in question, Far East can be liable for selling its defective pipe designed for use in Texas, to a Texas company to use in Texas, when it causes injuries in Texas." That case is not analogous. The argument before the Supreme Court involved the "causal link" element of specific jurisdiction, not the "stream of commerce plus" theory of specific jurisdiction. However, the Supreme Court's opinion sets out facts that explain why the Montana Supreme Court concluded the stream-of-commerce-plus theory was fully met by Ford's reaching out to and targeting the Montana automobile market::

> The company advertises in the State; "has thirty-six dealerships" there; "sells automobiles, specifically Ford Explorers[,] and parts" to Montana residents; and provides them with "certified repair, replacement, and recall services."

*Id.* at 1023 (quoting *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 443 P.3d 407, 414 (Mont. 2019) ("Ford's conduct satisfies the more-stringent stream of commerce plus theory, and we accordingly find it purposefully availed itself of the privilege of conducting activities in Montana, thereby invoking Montana's laws.")). By contrast, no evidence shows Far East Machinery advertises in Texas, has

dealerships in Texas, or provides Texas residents with repair, replacement, or recall services.

Appellees also cite *Spir Star AG v. Kimich*, 310 S.W.3d 868 (Tex. 2010). Spir Star AG was a German corporation that manufactured high-pressure hoses. To take advantage of the American market, Spir Star AG set up a limited partnership in Texas, Spir Star Limited, to act as its exclusive distributor in North America. *Id.* at 871. After a hose ruptured injuring Kimich, he brought suit against numerous defendants including Spir Star AG, which filed a special appearance. Spir Star argued that its having the distributor-intermediary, Spir Star Limited, prevented the Texas courts from acquiring jurisdiction over it. The Texas Supreme Court disagreed and explained how Spir Star AG targeted Texas for its sales using its distributor, Spir Star Limited. *See id.* at 875, 877–78. The supreme court found those facts sufficient to constitute an intent or purpose to serve the market in Texas. *Id.* at 878 ("If the foregoing evidence does not indicate an intent or purpose to serve the market in Texas, it is difficult to imagine what would." (internal punctuation omitted)). In this case, there is no evidence that Far East Machinery sought to serve the Texas market such as through a distributor like Spir Star AG had. *See Asahi*, 480 U.S. at 112; *see also Luciano*, 625 S.W.3d at 10 ("Evidence of such additional conduct may include advertising in the forum state, soliciting business through sales persons, or creating, controlling, employing the distribution system that brought the product into the forum state." (citations omitted)). There is no evidence that All-

Tex and Far East Machinery had an agreement for All-Tex to serve as its distributor. Far East Machinery denied a request for admission asking it to admit that it had a business relationship with All-Tex, and Chien Hsing Liu testified in his affidavit that "Far East Machinery Co., Ltd. has no business relationship with All-Tex."

Appellees also point to *Semperit Technische Produkte Gesellschaft M.B.H. v. Hennessy*, 508 S.W.3d 569 (Tex. App.—El Paso 2016, no pet.), a case similar to *Spir Star*. In that case, a European manufacturer, STP, made high-pressure hoses, one of which exploded at an oil-drilling site in Texas, injuring the plaintiff. STP had created a U.S. distributor in New Jersey, SIP, and STP owned all the shares of SIP. SIP sold STP's products nationwide; SIP's employees targeted its customers in Texas and contacted twenty-five to fifty prospective customers. *Id.* at 574. SIP sold the hose that exploded to Mid West, a sub-tier distributor in Oklahoma, which sold about half its inventory in Texas, including the hose at issue in that case. When STP manufactured the hose, it applied Mid West's markings to the hose, which allowed Mid West to resell the pipe under its own brand label. *Id.* at 573. The El Paso Court concluded this evidence showed STP "participated in a distribution network that in multiple ways delivered STP's product to Texas end users" and held the Texas courts could exercise jurisdiction over STP. In *Semperit*, the El Paso Court found the "plus" factor was the SIP "distribution network that in fact has resulted in STP selling millions of goods to Texas customers." *Id.* at 579. The court stated, "The volume of sales elevates this case beyond the 'random,' 'fortuitous' or attenuated

–35–

contacts alluded to *Burger King Corp. v. Rudzewicz*, 471 U.S. at 475–76." The court also stated that the branding of the hose for Mid West, a sub-tier distributor that targeted Texas, "demonstrates purposeful availment of the Texas marketplace." *Id.* at 580.

Unlike the distributors in *Spir Star* and *Semperit*, no evidence shows All-Tex was created by or a subsidiary of Far East Machinery, that All-Tex is managed by an officer of Far East Machinery, that All-Tex's employees reported to Far East Machinery, or that All-Tex was the exclusive distributor for Far East Machinery in Texas. *Cf. Spir Star*, 310 S.W.3d at 871, 877; *Semperit*, 508 S.W.3d at 573, 574. Spir Star's and Semperit's conduct evinced an intent to serve the Texas market through their distributors. In this case, Chien Hsing Liu testified there is no business relationship between Far East Machinery and All-Tex, and no evidence shows there is such a relationship between them.

Far East Machinery cites *Continental Alloys & Services (Delaware) LLC v. YangZhou Chengde Steel Pipe Co.*, 597 S.W.3d 884 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). In that case, CIEC, an American distributor of pipe, ordered pipe from YangZhou Chengde Steel Pipe Co. (Chengde). *Id.* at 888. The pipe was shipped "CIF," "cost, insurance, and freight," which is the same as shipping CFR except that the seller also contracts for insurance and pays the premium. *See id.* at 888, 895. CIEC sold the pipe to Continental Alloys. *Id.* at 888. Continental Alloys sued CIEC and Chengde in Texas state court alleging the pipe was defective.

*Id.* Chengde filed a special appearance, which the trial court granted and dismissed all claims against Chengde for lack of personal jurisdiction. *Id.* at 888, 889. The court of appeals affirmed. *Id.* at 897. In that case, Chengde had more connection with Texas and the Texas distributor CIEC than Far East Machinery had with All-Tex. There were contracts directly between Chengde and CIEC, *id.* at 894, whereas in this case there was no contract between Far East Machinery and All-Tex. Chengde's North American sales manager traveled to Texas and met with customers and potential customers of Chengde including Continental, *id.* at 893, whereas Far East Machinery's deputy manager traveled to Texas but did not conduct business, and the record does not show he met with representatives of All-Tex or All-Tex's customers.

Appellees argue that *Continental Alloys* is not analogous. They assert in their brief the case is distinguishable because "in that case, the pipe was legitimately sold to a third party the manufacturer did not control." However, there is no evidence in this case that Far East Machinery controlled Marubeni or All-Tex. Chien Hsing Liu, Far East Machinery's deputy manager, testified there was no business relationship between it and All-Tex. Appellees also assert *Continental Alloys* is distinguishable because the shipping term in that case was CIF while it was CFR in this case. As discussed above, the CFR and CIF shipping terms are identical except for the fact that with CIF the shipper has to provide and pay for insurance as well as shipping. Thus, Far East Machinery had fewer responsibilities to Marubeni and All-Tex than

Chengde had to CIEC.  Appellees also assert "there was no evidence in *Continental Alloys* that the defective pipe had been 'designed . . . for the market in Texas,' whereas here there is such evidence, as well as evidence showing that this design was used to market the pipe to the Texas market."  (citation omitted)  We assume appellees are asserting that the testing and specifications for the pipe to meet American Petroleum Institute's standards constituted Far East Machinery designing the pipe for the Texas market.  As discussed above, nothing in the record shows any special design was required by Texas that was unique to the Texas market.  None of these facts materially distinguish *Continental Alloys* from the case before us.

Far East Machinery established that it did not target the Texas market for selling pipe.  Accordingly, Far East Machinery did not purposefully avail itself of the privilege of conducting activities within Texas, and did not invoke the benefits and protections of its laws.  We conclude the trial court erred by denying Far East Machinery's special appearance.

## CONCLUSION

We reverse the trial court's order denying Far East Machinery's special appearance.  We render judgment dismissing appellees' claims against Far East Machinery for lack of jurisdiction.

/Lana Myers//
_____
210267f.p05                       LANA MYERS
                                  JUSTICE

–38–



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

Far East Machinery Co., Appellant

No. 05-21-00267-CV     V.

Isabel Aranzamendi, Individually and
as Beneficiary of Wilber Dimas,
Deceased, et al., Appellees

On Appeal from the County Court at
Law No. 5, Dallas County, Texas
Trial Court Cause No. CC-18-05668-
E.

Opinion delivered by Justice Myers.
Justices Partida-Kipness and Carlyle
participating.

In accordance with this Court's opinion of this date, the trial court's order signed April 2, 2021, denying the special appearance filed by appellant Far East Machinery Co. is **REVERSED** and judgment is **RENDERED** dismissing appellees' claims against appellant Far East Machinery Co. for lack of jurisdiction.

It is **ORDERED** that appellant Far East Machinery Co. recover its costs of this appeal from appellees Isabel Aranzamendi, individually and as beneficiary of Wilber Dimas, deceased; Pablo Morales Jaimes and Rosalina de Paz Puebla, as wrongful death beneficiaries of Filiberto Morales de Paz, deceased; Joel Tovar; Jorge Tovar; Victor Orozco; Abel Ponce Espinoza; Bethany Helen Morales, individually and as personal representative of the estate of Filiberto Morales de Paz, deceased; Rocio Guiterrez Diaz Deleon, as next friend of AMG, a minor; Jose Tovar; Aaron Haveron; Tonya Haveron; Richard Studer; Matthew Aaron; Rebecca Aaron, individually and on behalf of J.A. and S.A., minor children; Justin Barabas; Shelly Harwell; Vernon Barabas; Jessica Barabas; Jeffrey Barabas; Annette Romer, individually and on behalf of the estate of Michael Bruggman; Victor Orozco; Abel Ponce Espinoza; Jacob Rodriguez; Jose Antonio Reyes Torres; Nancy Shelton; and Matthew Lytle.

This Court's order signed June 3, 2021, staying the commencement of trial pending disposition of this appeal is **LIFTED**.

Judgment entered this 13th day of September, 2022.